**Benjamin BLACKBURN, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC. and Patricia Knowles, Defendants.**

No. CIV. A. 95–4709 (MTB).

United States District Court,
D. New Jersey.

April 28, 1998.

Walter A. Lucas, West Orange, NJ, for Plaintiff.

Kathleen M. McKenna, Proskauer, Rose, Getz & Mendelsohn, Clifton, NJ, for Defendants.

## OPINION

BARRY, District Judge.

This matter comes before the court upon the motion of defendants United Parcel Service, Inc. ("UPS") and Patricia Knowles ("Knowles") (collectively "defendants") for summary judgment pursuant to Fed.R.Civ.P. 56(b). For the reasons discussed below, defendants' motion will be granted and the complaint will be dismissed.

### I.

The background facts are uncomplicated and undisputed. In June 1986, UPS hired plaintiff, Benjamin Blackburn, as a package car driver. After receiving several promotions over the ensuing six years, plaintiff was transferred in the Spring of 1992 to a division of UPS charged with the responsibility of pricing its products and services. Plaintiff's duties included the development of

a flexible pricing project, which later became known as the "Incentive Administration System," or the "IAS project." In August or September of 1993, UPS promoted plaintiff to the position of Marketing User Representative in the Marketing Information Group in Mahwah, New Jersey. Among his duties as Marketing User Representative was management of the IAS project in New Jersey. Plaintiff's principal supervisor was Gary Hopwood ("Hopwood"), who was based in Atlanta, Georgia. Hopwood's supervisor was Nicholas Bain ("Bain"), who also was based in Atlanta, Georgia. Plaintiff remained as Marketing User Representative until he was terminated on September 29, 1994.

The crux of this matter is the reason for UPS's decision to terminate plaintiff's employment. UPS maintained at that time, and continues to maintain today, that it terminated plaintiff because he violated the company's anti-nepotism, favoritism, integrity, and accountability policies. Plaintiff, on the other hand, contends that he was fired because he was a "whistleblower," in violation of New Jersey's Conscientious Employee Protection Act ("CEPA" or the "Whistleblower Act"), N.J.S.A. 34:19–1 through 34:19–8.[1] The facts surrounding these very different purported reasons for plaintiff's termination have given rise to this suit.

### A.

UPS maintains and distributes to its management employees a Policy Book, which sets forth certain corporate, personnel, and operating policies and procedures. Since 1965, the Policy Book has contained some form of anti-nepotism policy. *Affidavit of James Daniels ("Daniels Aff.")* at ¶¶ 2–3. The 1992 version of the anti-nepotism policy, which was in effect during the events in question, stated as follows:

**We Strictly Limit the Employment of Relatives.** In order to help maintain equal opportunity of employment for the general public and equal opportunity of promotion for our employees, and in order to eliminate a possible source of pressure on our Human Resources managers and other management people, we strictly limit the hiring of relatives.

This policy helps us avoid misunderstandings, acts of favoritism, or the perception of favoritism that could arise were an employee in a position to influence the hiring, work, or advancement of a relative.

*Therefore, we prohibit hiring—for either full-time or part-time employment—relatives of active employees* and also relatives of former district managers or former managers with equivalent or higher levels of responsibility.

For the same reasons, we discourage continuation of the full-time or part-time employment of any employee who marries another employee while either person holds a management position in the same district, the same region office or Corporate Headquarters. In such cases, we will attempt to find a new assignment for one of these employees so that their positions will be geographically and organizationally separate. If we are unable to do so, the decision as to which spouse will remain with the company is left to the couple.

*Id.* at Exhibit E (emphasis added).

At the time of plaintiff's termination, the Policy Book also contained the following policies concerning favoritism, integrity, and accountability:

**We Treat Our People Fairly and Without Favoritism.** We believe that impartiality is the foundation of a loyal, cooperative work group.

---

1. Although plaintiff now contends that he was terminated for being a whistleblower, he previously took the position that he was terminated for other reasons. In May of 1995, plaintiff filed a charge of discrimination and a complaint with the Equal Employment Opportunity Commission ("EEOC") and New Jersey Department of Law and Public Safety–Division on Civil Rights ("DCR"), respectively, alleging that he was terminated because of a purported disability, in violation of the Americans with Disabilities Act and the New Jersey Law Against Discrimination. *Affidavit of David W. MacGregor ("MacGregor Aff.")*, Exhibits 16–18. Plaintiff also told his psychiatrist that he was terminated for several reasons, including his use of profanity, history of depression, and religion. *Transcript of Dr. Laurence Lorefice's Deposition* at 78. In none of these instances did plaintiff mention that he was terminated because of any whistleblowing activities.

We want to treat our people as individuals, but without causing the perception of special treatment.

We have the responsibility to avoid any relationship that may result in actual or perceived favoritism.

*MacGregor Aff.,* Exhibit 12 at 32.

**We Insist Upon Integrity In Our People.** We present our company honestly to employees and, in turn, expect them to be honest with us.

We expect honesty from our people in their handling of money, merchandise, and property with which they are entrusted. We insist on integrity in the preparation and approval of all reports.

We expect our people to be honest with respect to intangible things as well—in the time, effort, and full performance of their jobs; in fair play in dealing with others; and in the acknowledgment of mistakes or other shortcomings.

The great majority of our people are of high moral character. However, when we do discover a dishonest person in our organization, we deal with that individual quickly and firmly. For our company to be known for its integrity, each one of us must meet high standards.

*Id.* at 44.

**We Are All Accountable for Compliance With Our Policies.** As individuals, we do not have the authority to change or disregard any of our company's policies. We are expected to follow existing policies, even if not always in complete agreement with them. We must be careful not to misinterpret or violate a policy's spirit and intent. If in doubt, we should check with others for guidance.

To ensure a more complete understanding, we encourage discussion of our policies at our business meetings.

Our managers and supervisors set the example for carrying out our policies. They have accepted the responsibility of working toward the attainment of our Corporate Mission. They, therefore, are expected to lead the way for other UPS people—by word and action—in living up to our policies.

*Id.* at 18. As a management employee, plaintiff received a copy of the Policy Book and was aware of each of the foregoing policies.

Plaintiff married Loren Morrisey in April 1990. On September 29, 1993, Linda Shepard ("Shepard"), who is Loren Morrisey's sister and plaintiff's sister-in-law, applied for a job at UPS's Mahwah, New Jersey facility. In response to a question on her employment application, Shepard stated that she did not have any relatives who were employed by UPS. In December 1993, UPS hired Shepard as a Methods Analyst at its Mahwah, New Jersey facility. Plaintiff, who was aware that Shepard had applied for and obtained such a job, did not disclose their familial relationship to UPS. Additionally, plaintiff later recommended Shepard for other positions at UPS without informing those to whom he made the recommendations that Shepard was his sister-in-law.

On September 14, 1994, UPS's Loss Prevention Department received an anonymous complaint, which was then forwarded to defendant Patricia Knowles of UPS's Human Resources Department at the Mahwah, New Jersey facility. The anonymous complaint purportedly claimed that plaintiff was Shepard's brother-in-law and expressed a concern that Shepard might receive a promotion due to plaintiff's influence. On September 15, 1994, Knowles confronted plaintiff about his relationship with Shepard. Plaintiff denied that he was "related" to Shepard, but admitted that he was married to her sister. Two weeks later, after further discussion among UPS management, Bain terminated plaintiff, purportedly because he violated UPS's anti-nepotism, favoritism, integrity, and accountability policies by not disclosing to UPS his relationship with Shepard.

## B.

Plaintiff contends that the actual reason for his termination had nothing to do with his familial relationship with Shepard. Indeed, he maintains that he commuted with his sister-in-law to and from work, entered the building with her each morning, met with her occasionally for lunch and breaks, displayed prominently on his desk a picture of his wedding party, which included Shepard, and

was otherwise open about their relationship. Although plaintiff apparently does not believe that Shepard should be considered his "relative," a term that is not defined in the UPS Policy Book, his principal argument in this regard is that UPS had not previously enforced its anti-nepotism policy, and did so in this instance only as a pretext for the real reason behind his termination: retaliation for his persistent complaints regarding UPS's pricing system.[2]

Specifically, plaintiff contends that he was terminated because he verbally and by way of five written memos (four to Hopwood and one to Bain) complained about or, in plaintiff's word, "questioned" UPS's pricing practices. *Pl.Dep.Tr.* at 228. Because these conversations and memos will determine, in large part, whether plaintiff can survive the instant motion, they will be discussed in appropriate detail below.[3]

In his deposition, plaintiff testified about conversations he had with several UPS employees, including John Sutthoff, Rich Cooley, Joe Pyne, and Hopwood. During these conversations, plaintiff testified, he expressed his belief or opinion that: (i) inadequate "resources ... were being devoted to the [IAS] project," *Pl.Dep.Tr.* at 310–11; (ii) "the project was going off the deep end," i.e., it was at a "standstill" and had "completely unraveled" in terms of management and direction, *id.* at 245; (iii) the pricing system was not functioning "the way it was supposed to function," *id.* at 246; and (iv) "management practices as they related to testing of the system were unsound and uncompleted." *Id.* at 247. Plaintiff further testified that he expressed his concern about whether UPS's pricing system "was in compliance with legal standards," *id.* at 331–32, and "where [the IAS] project was going with respect to anti-trust." *Id.* at 341. After one of his conversations with Hopwood, plaintiff told Hopwood that he would be developing a memo to further clarify his concerns. *Id.*

The memo to which plaintiff referred—a memo described by plaintiff as "more of a question than ... an objection," *id.* at 228— was sent to Hopwood on March 22, 1994, and stated as follows:

> As per our recent phone conversation, I'm detailing here areas where I believe that we may run into significant problems with respect to Anti–Trust issues going forward.

> I would appreciate your running these by Joel Creamer in order to determine whether these issues will present legal obstacles.

> 1) No security check exists at present to authenticate or assure that the information entered by field users is either accurate or valid. As you know, it is important that user information be subject to some type of validation process or, in the worst case scenario, we may be providing a discount level that could easily be interpreted as predatory in nature.

> While I am unsure as to the extent of our obligation in this area, it seems to me that we must have some type of system in place that will authenticate, to some reasonable degree, the input data that our sales reps are entering in order to develop prices. To leave this to their discretion is, I believe, flirting with disaster under the present scenario.

2. Plaintiff cites several examples of UPS employees who are "related" by either blood or marriage and have not been disciplined or terminated. *Affidavit of Benjamin Blackburn ("Pl.Aff.")* at ¶ 40; *Transcript of Benjamin Blackburn's Deposition ("Pl.Dep.Tr.")* at 106, 812–44; *see also Transcript of Linda Shepard's Deposition ("Shepard Dep.Tr.")* at 131–38; *Transcript of Patricia Knowles's Deposition ("Knowles Dep.Tr.")* at 78–81, 96–102; *Transcript of Patrick Toomey's Deposition ("Toomey Dep.Tr.")* at 50–52. UPS contends, however, that within the last five years, twenty-nine persons employed at the Mahwah facility left UPS in accordance with the anti-nepotism policy, *Affidavit of Patricia Knowles ("Knowles Aff.")* at ¶ 4, and that there are no persons employed by UPS who are exceptions to the present policy. *Affidavit of Patrick Toomey* at ¶ 5. Were it necessary to reach the issue of pretext, this factual dispute would require that defendants' motion for summary judgment be denied.

3. Although irrelevant for purposes of this motion, defendants contend that no one at UPS saw or received any such memos until they were produced in connection with this litigation. *Transcript of Gary Hopwood's Deposition ("Hopwood Dep.Tr.")* at 70, 92–99, 102; *Transcript of Nicholas Bain's Deposition ("Bain Dep.Tr.")* 77–82, 95.

Obviously, Creamer will have a much better sense about the company's obligation here but to expound upon my concern a bit more, it occurs to me that a challenge to our pricing methodology cannot be defended merely by the company taking the position that it didn't know what its sales reps were doing in developing discounts. That is to say, it is difficult for me to see where a posture of "see no evil, hear no evil ..." is especially wise given our current position in the Ground marketplace. I urge you to take action to determine whether this is as significant as I fear it may be down the road.

2) The present combination of Mark Matulavicus and Leslie Gilstrap working as representatives of the Strategic Cost groups causes me grave concerns as I have been unable, as you know, to get any real commitment from their manager as to the level of comfort we should have in determining whether their costing methodology is indeed in line with regularly accepted costing practices or whether the Incentive Administration System is intended to be built using trial methodology. The concern here is complex but I believe bears comment. First, the fact that these folks live in Atlanta and work in New Jersey on a part-time basis presents a problem where continuity is concerned. I have serious concerns as to whether the proper amount of attention has been given the development of testing and assuring the proper function of the cost calculator contained within IAS based on the very limited testing that has been done to date. I believe that this leaves us, again, in an awkward position with respect to justifying the accuracy and consistency of the data upon which our pricing is developed.

My thoughts are shared by a number of other people working on the project and I would invite you to pose this question to any of the team members: If you had to sign your name agreeing that the system you've built is functioning properly, is correctly calculating discounts to a reasonable degree and is within the boundaries of accepted standards for system integrity, would you?

My feeling is that we wouldn't have many volunteers signing up and I certainly wouldn't be among them.

*MacGregor Aff.*, Exhibit 7.

On April 18, 1994, plaintiff sent a second memo to Hopwood, which stated as follows:

During our last group conference call on the subject of whether the latest release of IAS was on target and ready to be rolled out to the field, a number of concerns were stated on the New Jersey side which I believe bear some comment outside of our usual forum.

As Rich Cooley has said on many occasions, the level of comfort both he, I and others feel regarding our readiness to move forward with the current system falls significantly short of any reasonable degree of confidence.

While this is old news, we have as yet to validate to anyone's satisfaction the idea that IAS is actually calculating discounts correctly. The recent slew of internal failures make this crystal clear to those of us working with the system on a day to day basis.

I fully understand the organization's dire need for the next version of IAS but it is impossible, at this point, for either Rich or myself to agree that any of the necessary checks have been completed in order to assure any reasonable degree of accuracy.

When we continue to run into billing interface problems which cause hundreds of customers to be billed improperly, as we have, I believe that the company's dire need must be weighed against the impact of releasing yet another version of a system that simply isn't functioning correctly, since the resulting impact to both our customers and, potentially, our liability could be significant.

In March, I had requested that you follow-up with the legal group to ascertain our position with respect to these concerns.

As I have not heard back from you on this, I respectfully submit that we are currently in an untenable position with respect to the next release of the system. My hunch is that unless we have resolution of the issues

here in a real hurry, I will have a great deal of difficulty signing off on the system. While I understand that these issues are terribly complex and will take some time to address, I believe that we ought to try and get things straightened out before we end up having to explain ourselves to someone outside of our organization.

*Id.*, Exhibit 8.

On June 3, 1994, plaintiff sent the following memo to Nicholas Bain:

Please contact me at your earliest convenience. I would like to address serious concerns I have with the IAS system that I believe will have gravely negative implications for the organization. Please leave me a voice mail message on x7351 and let me know when it would be convenient to discuss several critical issues.

I have attempted, along with others members of the NJ group, attempted to address these concerns with Gary but have not received comment or direction. Both Rich Cooley and I have serious reservations as to whether the system we are building is indeed functioning properly and the potential outcome of this may be significant both internally and externally.

*Id.*, Exhibit 9.

Plaintiff's penultimate memo to Hopwood, dated June 15th, 1994, stated as follows:

To bring you up to date on where we stand with IAS, I have attempted to express my concerns regarding the proper functioning of the system with you on several occasions. To date, I have not heard back from you, outside of one conversation where you mentioned that you had received my correspondence and had discussed the concerns with the appropriate parties in Atlanta.

Since I have not received any specific direction regarding this, I will again make it clear that I have serious concerns about the rate we are moving and what I believe to be the gross negligence of our group in assuring that the system works properly and, dare I say, within the confines of ordinary accepted business principles.

These include the methodology IAS uses to cost and price as well the support the project has received in terms of so-called subject matter experts. Sending Skip Campbell up as a representative of the Corporate Pricing group is not, in my estimation, not supportive of the idea that we are taking our group's concerns seriously. Skip knows very little about the system and supplying him because we "don't have anyone else available" is continuing to overlook very serious problems with the system itself.

Neither Rich nor I feel confident that Skip or Dave Lewis or any other lay folks from Marketing are capable of taking up the issues that we have raised time and time again, nor do they appear to be oriented towards actually finding problems with the system. It seems more that they were sent up from Atlanta for "rubberstamp" purposes so that the system could be checked off and released.

Ultimately however, I am the person whose signature ends up in the "approved" column, not Skip's and not Dave's. At this point in time, I cannot in good conscience sign off on a system that has been built to the specifications that this has, one which has only a nodding acquaintance with any type of reasonable testing. Our billing problems have, I believe, only began to show themselves for what they truly will be come yet another release of the system and I am extremely uncomfortable with the idea of signing off on something that is not only wrong but very likely illegal in the way that it is used.

You have indicated to me that I should "relax" about this and stated that the issues are too complex for ordinary folks to understand. I must say that while I agree that the issues are indeed complex, it won't take a rocket scientist to figure out that the methodology we've used in creating this system lacks a basic integrity that is at the core of any worthwhile endeavor. I fear that the result will not only be a loss of confidence by our customers but also willingly and knowingly violates fundamental obligations we have as an organization to our fellow employees, our customers and the public.

It certainly wouldn't take a genius to pick apart the cost model as it stands at present and I suspect that we could easily find glaring departures from commonly accepted costing practices. The long and short of this is that I believe that we have a problem that could potentially run the risk of damaging not only the company's reputation but also our customers confidence in our pricing methodology.

Last but not least, I believe strongly that any challenge to the practices in place would not stand a legal litmus test. For this reason, I urge you on this count to not only discuss the implications of this with the legal staff but to also take another crack at making the Strategic Costing group aware of the potential impact should additional qualified resources not be assigned to work on the project.

My understanding of our obligation in this area makes it clear in my mind that we are continuing along the track of being penny-wise and pound-foolish, something I believe we cannot afford from any reasonable point of view.

Let me know you[r] thoughts on this and how we should move forward with these concerns.

*Id.*, Exhibit 10.

On August 12, 1994, plaintiff sent his final memo to Hopwood:

Yesterday we had our TLA at your request. I've written up the following summarization in order to highlight the key points of what became a very disturbing discussion.

The first topic on your agenda was a discussion of my performance and role as they relate to the Marketing group. In reviewing my performance, you indicated that I am performing at a very high level technically (witness my 4.9 grade during the most recent quarter). You also indicated that you feel I need to improve in the area of "being a team player".

As you stated, your concern regards my continued criticism of the methodology used in IAS to apply pricing formulas which may violate Anti–Trust regulations.

At best, your comments are deeply troubling to me and as I stated during our conversation, difficult to reconcile with my responsibilities as a partner in our organization.

I believe that I have an obligation to raise these concerns and your demand that I "not discuss these with others" is especially difficult in light of the fact that my concerns have been on-going for some time.

As a project manager, it is difficult for me to see where the combination of an under-staffed and underskilled project team can possibly address issues of this complexity and import.

I have repeatedly informed you that there exists serious doubt regarding the current system's ability to support proper and sound pricing yet no action has been taken to investigate a system of practices that can best be described as chaotic, owing to contradictory decision-making on the part of our policy-setting group.

You have agreed on numerous occasions with both Pat Toomey and myself that this situation must be corrected immediately if we are to avoid a significant set of legal problems going forward. The departure of Leroy Hasen is an example of action contradictory to our managing the process properly and has caused considerable concern among those working on the project.

At present, there is no one on the project team capable of determining the extent to which these issues may impact the organization and it is my opinion that a continuation of this situation makes our position highly untenable and extremely vulnerable. While I can appreciate the difficulty of bringing qualified folks on board to address the larger issue of what we are doing with our pricing practices, I must nevertheless continue to remind you of our obligation to assure proper pricing practices in light of our role as the marketplace leader in the ground segment.

As I have mentioned to you numerous times, the stress that this subject has caused me is tremendous and has been instrumental in the development of serious health problems that originally led me to

request a transfer from the Marketing Information group.

While I believe that I have been a solid "team player" throughout my career, I am deeply bothered by your clear message that my success on this project depends more on my willingness to tow a line of silence amid seriously questionable and unethical pricing and management practices than on traditional measures of accountability.

Your references to me as an "unimaginative stick in the mud", a "snitch" and most interestingly, as a "nosy, bean counting Jew" are unwanted, embarrassing and frankly, unprofessional. While it is extremely difficult to be in a position where I feel forced to request that we meet with a third party to discuss these and others concerns. I am afraid that this is the direction that we are heading in.

I would like to believe that we could settle these problems as professionals....

\*     \*     \*     \*     \*     \*

*Id.*, Exhibit 11.

Plaintiff contends that he was terminated for disclosing and objecting to UPS's practices in the foregoing conversations and memos or, as he puts it, for "being a squeaky wheel and a pain in the ass." *Pl.Dep.Tr.* at 901. The question before the court is whether defendants violated CEPA.

## II.

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, a court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). "[A]t the summary judgment stage[,] the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment must be granted, however, if no reasonable trier of fact could find for the non-moving party. *Id.*

■ CEPA was enacted in 1986 to protect from retaliatory action employees who "blow the whistle" on employers engaged in illegal or harmful activity. *Young v. Schering Corp.*, 141 N.J. 16, 23, 660 A.2d 1153 (1995) (citing *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 417–18, 650 A.2d 958 (1994)). The Act derives from New Jersey's common law prohibition against the retaliatory discharge of at-will employees, as first articulated in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505 (1980). *See Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 178, 707 A.2d 1000, 1008 (1998); *Young v. Schering Corp.*, 141 N.J. at 26, 660 A.2d 1153; *Young v. Schering Corp.*, 275 N.J.Super. 221, 234, 645 A.2d 1238 (App.Div.1994), *aff'd*, 141 N.J. 16, 660 A.2d 1153 (1995). To that end, CEPA provides, in pertinent part, as follows:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor ... an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;

\*     \*     \*     \*     \*     \*

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. § 34:19–3.

■ In order to maintain a cause of action under subsections (a), (c)(1), or (c)(2) of

CEPA, plaintiff must satisfy two elements. First, he must show that he reasonably believed at the time he articulated his concerns that his employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law. *See Falco v. Community Medical Center,* 296 N.J.Super. 298, 314, 686 A.2d 1212 (App.Div.1997) (quoting *Mehlman v. Mobil Oil Corp.,* 291 N.J.Super. 98, 123, 676 A.2d 1143 (App.Div.1996), *aff'd,* 153 N.J. 163, 707 A.2d 1000 (1998)). Second, he must show that: (i) he performed a "whistleblowing" activity described in N.J.S.A. 34:19-3(a), (c)(1), or (c)(2); (ii) he was terminated; and (iii) there was a causal connection between his whistleblowing activity and the termination. *Falco,* 296 N.J.Super. at 317, 686 A.2d 1212 (quoting *Littman v. Firestone Tire & Rubber Co.,* 709 F.Supp. 461, 470 (S.D.N.Y.1989) (applying New Jersey law)) and citing *Young v. Schering Corp.,* 275 N.J.Super. at 233, 645 A.2d 1238 (also quoting *Littman* ); *Moore v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* No. 90–1182 (CSF), 1991 WL 149881, at *4 (D.N.J. July 23, 1991) (same).

Defendants argue that they are entitled to summary judgment because: (i) plaintiff cannot establish either of the two elements, and thus has not set forth a *prima facie* case under CEPA; (ii) there was a legitimate, non-discriminatory reason for terminating plaintiff's employment; and (iii) plaintiff cannot demonstrate that the legitimate, non-discriminatory reason for terminating his employment was pretextual.[4] In other words, defendants maintain that plaintiff has failed to satisfy each of the three steps of the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Parenthetically, although some courts appear to have applied the *McDonnell Douglas* burden-shifting framework in CEPA cases, *see, e.g., Lawrence v. National Westminster Bank, N.J.,* No. 94–1368, 1995 WL 506043, at *7 (D.N.J. Aug.16, 1995); *Abbamont v. Piscataway Twp. Bd. of Educ.,* 269 N.J.Super. 11, 25, 634 A.2d 538 (App.Div.1993), *aff'd,* 138 N.J. 405, 650 A.2d 958 (1994), this court is not aware of any case in which the issue of its applicability to a CEPA case was formally addressed. Because that framework would seem to apply equally to wrongful discharge cases brought under CEPA as to those brought under federal and New Jersey discrimination statutes, and because the parties, albeit without any citation to authority, have utilized it in their papers, the court will apply it here. Under this framework, plaintiff has the initial burden of establishing a *prima facie* case. If he does so, the burden shifts to UPS to articulate a legitimate, non-discriminatory reason for the employment action. If UPS satisfies its burden, the burden shifts back to plaintiff to show that the asserted non-discriminatory reason was not the true reason but merely a pretext for discrimination. *See Jansen v. Food Circus Supermarkets,* 110 N.J. 363, 380–81, 541 A.2d 682 (1988).

---

4. Additionally, Knowles maintains that, even if plaintiff can survive a summary judgment motion as to UPS, there is no legal or factual basis upon which to base a CEPA claim against her. As demonstrated by plaintiff's own deposition testimony, Knowles is correct. When questioned at his deposition regarding the factual bases for his allegations against Knowles, plaintiff testified as follows:

Q. ... Why do you believe that Ms. Knowles was directly involved in the decision to terminate your employment?
A. She was the first person that I dealt with on the subject.
Q. Other than the fact that she was the first person that you dealt with, is there anything else that causes you to conclude that Ms. Knowles was directly involved in the decision to terminate you?
A. I'm not sure.

Q. Do you know what the extent of Ms. Knowles's involvement was in the decision to terminate your employment?
A. I don't.
*Pl.Dep.Tr.* at 846–47.
\* \* \*
Q. Do you believe that Ms. Knowles retaliated against you at any time?
A. Yes.
\* \* \*
Q. What was she retaliating against you for, in your opinion?
A. That's a very good question.
Q. Do you know what Ms. Knowles was retaliating against you for?
A. Do I know? No, I don't know.
*Id.* at 847–48. In view of this testimony, plaintiff lacks a factual basis to maintain a whistleblower claim against Knowles.

Before considering whether plaintiff has established his *prima facie* case, however, the court must determine, as a matter of law, whether there exists a clear expression of law, either in a statute or rule or in a regulation promulgated pursuant to a statute, that *"would be violated* if the facts as alleged are true."[5] *Fineman v. New Jersey Dep't of Human Servs.*, 272 N.J.Super. 606, 620, 640 A.2d 1161 (App.Div.1994) (emphasis added); *see also Falco*, 296 N.J.Super. at 316, 686 A.2d 1212; *Regan v. City of New Brunswick*, 305 N.J.Super. 342, 353, 702 A.2d 523 (App.Div.1997); *see also Mehlman*, 153 N.J. 163, 186, 707 A.2d 1000, 1012 (citing *Fineman* for the proposition that the initial determination of whether the plaintiff "has established the existence of a clear mandate of public policy is an issue of law"). The court need not look any *further* than the summary of antitrust law contained in the UPS "Guidelines for Antitrust Compliance" to determine that there *exists* a clear expression of law pertaining to the subject matter of plaintiff's complaints.[6] Plaintiff has not, however, provided the court with a scintilla of evidence,—either in the five memos or the various conversations with UPS personnel[7] —that would permit this court to conclude, as a matter of law, that any antitrust law

would be *violated* if the facts, as described by plaintiff, were true.

Even when viewed as liberally as possible, the memos and conversations show only that plaintiff, as he was obligated to do in his managerial capacity, brought several potentially problematic issues to his employer's attention. In doing so, plaintiff expressed his concern about or disagreement with the pricing system UPS was developing and experimenting with—a "work in progress"—which, in plaintiff's opinion, *might* not operate properly without additional resources, which *might* then result in customers receiving improper discounts, which *might*, in turn, raise certain legal issues. Indeed, even in his final memo—the memo of August 12, 1994—plaintiff expressed "serious doubt" regarding the system's ability to support proper pricing and concern that there was no one on the project capable of determining the extent to which this (and other) issues "may" impact the organization. An employee's belief, however sincere, that a law *might* someday be violated if certain precautions are not taken or certain changes are not made simply does not violate any law of which this court is aware. This court cannot, therefore, determine as a matter of law that a law

5. Although the court will make this determination, as it must under the law of the State of New Jersey, *it questions whether it is otherwise appropriate to do so*. First, requiring the court to determine, at the outset, whether the alleged wrongful activities, if true, *would* be unlawful appears antithetical to the language and intent of the statute. That is, if the court initially determines that a certain act is not unlawful (perhaps for a technical reason that would not ordinarily be understood by a lay person), the plaintiff would be precluded from showing that it was nonetheless *reasonable* for him or her to believe that the act was unlawful. Such a result does not comport with the unambiguous language, let alone the spirit, of CEPA, which clearly focuses on the plaintiff's *reasonable belief*. It would seem more appropriate for a court simply to determine, at the outset, whether a law or public policy applicable to an employer's conduct exists (i.e., not whether it would actually be violated) and, if so, proceed to determine whether the plaintiff has established his or her *prima facie* case. *See Mehlman*, 153 N.J. 163, 196, 707 A.2d 1000, 1017 (dissent) ("The employee must only have a reasonable belief that the employer's conduct violated the policy. Before a cause of action is stated, however, the court must find that

such a policy actually exists.") That said, the court will apply the test, without alteration, that has been applied in this State.

6. The Guidelines summarize, in six pages, the Sherman, Clayton, Robinson–Patman, and Federal Trade Commission Acts as well as state and international antitrust laws—quite a feat, indeed. *MacGregor Aff.*, Exhibit 14 at 6–12. Given the disposition herein, this court need not isolate a specific section of a specific antitrust statute which pertains to the subject matter of plaintiff's complaint.

7. Of course, the court is concerned only with the memos and conversations in which plaintiff allegedly "blew the whistle" on UPS within the meaning of N.J.S.A. 34:19–3. The court is not concerned with any information plaintiff might later have gathered, opinions plaintiff might later have formed, or any other information regarding the unlawfulness of any UPS activity now alleged by plaintiff but to which he did not object during the course of his conversations with or in his memos to UPS. Plaintiff's brief in opposition to this motion is replete with such *post hoc* information, opinions, and rationalizations.

"would be violated if the facts as alleged are true."[8]

Even if this court were able to make this preliminary determination, however, plaintiff still would be unable to satisfy either element of his *prima facie* case. As to the first element, and as an initial matter, defendants maintain that plaintiff's CEPA claim must fail because *he*—as opposed to the court—has not identified a specific statute or regulation underlying his claim. The court disagrees. It is well established that CEPA does not require a plaintiff to "know, to a legal certitude, the precise contours and components" of the law that has purportedly been violated. *Falco*, 296 N.J.Super. at 313, 686 A.2d 1212; *Mehlman*, 291 N.J.Super. at 122, 676 A.2d 1143; *see also Mehlman*, 153 N.J. 163, 193, 707 A.2d 1000, 1015 ("Specific knowledge of the precise source of public policy is not required. The object of CEPA is not to make lawyers out of conscientious employees ..."). Nor does this requirement demand "proof that the practices ... allege[d] are actually unlawful." *Young v. Prudential*, 297 N.J.Super. at 627, 688 A.2d 1069. "The *sine qua non* of [the first element of] a CEPA claim is not the actual occurrence of a violation of promulgated authority ..., but rather the existence of a reasonable belief to the effect that such authority ... has been breached." *Mehlman*, 291 N.J.Super. at 123, 676 A.2d 1143 (citing *D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 542, 628 A.2d 305 (1993)).

As discussed above, "[i]f the evidence proves that [an employer's] behavior was unlawful, the reasonableness of [the plaintiff's] perception will have been established." *Young v. Prudential*, 297 N.J.Super. at 627, 688 A.2d 1069. But "[e]ven if the evidence does not establish conduct that is unlawful ..., [a plaintiff's] perception may be found to have been reasonable." *Id.* (citing *Delran*

*Educ. Ass'n v. Delran Bd. of Educ.*, 277 N.J.Super. 538, 543–44, 650 A.2d 7 (App.Div. 1994)). "Of course, if [plaintiff's] belief, however sincere, was objectively unreasonable, his actions are not protected activity and his CEPA claim must fail." *Id.*

This court will assume, albeit with no great confidence, that, at least to some degree, plaintiff relied on UPS's "Guidelines for Antitrust Compliance," *see* note 6, *supra*, in forming his beliefs regarding UPS's pricing practices, although plaintiff candidly testified that he did not recall when he read the Guidelines or whether he understood them, and he did not recall seeing references in the Guidelines to the Legal and Regulatory Group.[9] Rather, whatever plaintiff knew about antitrust issues came, for the most part, from informal discussions "over ... many cups of coffee" with other members of the department. *Pl. Dep.Tr.* at 54, 69, 608.

Even giving plaintiff the benefit of some limited knowledge of antitrust law, an objective trier of fact could not possibly find that he reasonably believed that the conduct he disclosed *was unlawful*, as required under the first element. CEPA does not merely require that the employee subjectively believe that certain activities have taken or are about to take place. In order for an employee's belief to be considered "reasonable," that belief must be such that "a reasonable lay person would conclude that *illegal activity was going on*" or, at the very least, is imminent. *Young v. Schering Corp.*, 275 N.J.Super. at 233, 645 A.2d 1238 (quoting *Littman*, 709 F.Supp. at 470) (emphasis added); *see also* N.J.S.A. 34:19–3(a) and (c)(1) (requiring employee to have a reasonable belief that an activity, policy, or practice of his or her employer "*is in violation of a law ...*") (emphasis added); *Mehlman*, 291 N.J.Super. at 123, 676 A.2d 1143 (citing *D'Agostino*, 133

8. Although the court need not proceed any further, it will do so in order to demonstrate that the vague and speculative nature of plaintiff's disclosures and objections is equally fatal to each of the two elements of his *prima facie* case.

9. The Guidelines instruct that evaluations of possible *antitrust behavior and consequences* should be left to UPS's lawyers, who are specialists in the field, and such matters should be reviewed

with UPS's Legal and Regulatory Group. *MacGregor Aff.*, Exhibit 14 at 16, 24–25. Similarly, a Business Ethics Memorandum, which was issued to all managers on April 12, 1993, required managers to direct any concerns regarding antitrust compliance to the Legal and Regulatory Group. *Id.*, Exhibit 20 at 4–5. Plaintiff never relayed any such concerns to the Group. *Pl.Dep.Tr.* at 655–56, 659.

N.J. at 542, 628 A.2d 305) (holding that, although an employee need not necessarily prove "the actual occurrence of a violation of promulgated authority," he must demonstrate that he had a "reasonable belief ... that such authority ... *has been breached*").

■ Moreover, despite plaintiff's allegation that he has now unearthed certain violations that might reasonably be considered unlawful, *see, e.g., Pl.Dep.Tr.* at 606–24, plaintiff did not say so in any of his memos to and conversations with UPS.[10] As discussed above, plaintiff merely conveyed his *concerns,* through various memos and conversations, that a law might at some point in the future be violated if certain precautions were not taken or changes not made in the pricing system then being developed. He also questioned, disagreed with, and expressed his level of discomfort about his employer's practices. Plaintiff never conveyed a reasonable belief, however, that the activities about which he complained *were unlawful* such that "a reasonable lay person" *could* "conclude that illegal activity was going on." Indeed, he stated quite the contrary when, in April of 1994, in the midst of the alleged flurry of memos and conversations, he completed UPS's Business Ethics Questionnaire responding "no" to questions such as "Have you used, or are you aware of the use by others, of UPS funds or assets for any unlawful or improper purpose?" and "Are you aware of other violations of UPS's business ethics policies?" *MacGregor Aff.,* Exhibit 23. Accordingly, plaintiff cannot satisfy the first element of the *prima facie* test.

■ For similar reasons, plaintiff cannot establish the second element of the *prima facie* test. In order to satisfy the second element, plaintiff must show that: (i) he performed a "whistleblowing" activity; (ii) he was terminated; and (iii) there was a causal connection between his whistleblowing activity and the termination. *Falco,* 296 N.J.Super. at 317, 686 A.2d 1212; *Young v. Schering Corp.,* 275 N.J.Super. at 233, 645 A.2d 1238; *Moore,* No. 90–1182 (CSF), 1991 WL 149881, at *4. As the Supreme Court of New Jersey has explained, "the core value that infuses [the] CEPA is the legislative determination to protect from retaliatory discharge those employees who, 'believing that the public interest overrides the interest of the organization [they] serve[ ], publicly 'blow[ ] the whistle' [because] the organization is involved in corrupt, illegal, fraudulent

10. Once again, in order to find for plaintiff on the first element, a trier of fact would have to consider the actual conduct that was the subject of plaintiff's complaints, and determine whether plaintiff reasonably believed that *those* activities were unlawful. Although plaintiff alluded, in his deposition, to what he believes to be actual, as opposed to potential, unlawful acts committed by UPS, *id.,* he has not provided any evidence to this court that he disclosed such acts to anyone at UPS. Indeed, even at his deposition, before which he had much time to prepare and which lasted several days, plaintiff remained non-specific as to the who, what and when of any supposed unlawful activity. *See, e.g., id.* at 609–10, 619. Moreover, while plaintiff raised as complaints everything but the kitchen sink, he made only fleeting and vague references to antitrust.

Plaintiff's brief and affidavit submitted in response to defendants' motion for summary judgment tell a different story, however. In his brief, plaintiff cites to several violations of antitrust law, using numerous antitrust trigger words. That brief, however, relies in large part on the belated affidavit, and the facts stated therein are otherwise belied by the record. For example, in the affidavit, for the first time, plaintiff offers a few specific examples of unlawful activity allegedly committed by UPS. In doing so, plaintiff uses the same trigger words which appear in the brief, but which were barely used, if they were used at all, in his memos and contemporaneous conversations or even in his extensive deposition, and, for the first time, uses "was violating" as opposed to "might violate" language. Because the affidavit contradicts the earlier deposition testimony in important respects, it will not be considered for purposes of determining whether there is a genuine issue of material fact as to whether plaintiff reasonably believed at the time he was supposedly whistleblowing that defendants had committed or were committing unlawful activities. *See Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) (court may disregard nonmovant's affidavit for purposes of summary judgment if it contradicts earlier deposition testimony); *Martin v. Merrell Dow.Pharmaceuticals, Inc.,* 851 F.2d 703, 705–06 (3d Cir.1988) ("When ... the affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction," the district court may disregard the subsequent contradictory affidavit for purposes of determining whether there is a genuine issue of material fact). To the extent that plaintiff's brief relies on his affidavit or is otherwise belied by his memos and conversations, it, too, will not be considered.

or harmful activity.'" *Mehlman,* 153 N.J. 163, 186, 707 A.2d 1000, 1012 (emphasis added) (quoting Ralph Nader, et al., *Whistleblowing: The Report of the Conference on Professional Responsibility* (1972)).

Plaintiff obviously cannot "blow the whistle," as defined in the Act, unless he *actually disclosed or objected to* conduct that would reasonably be considered unlawful. Plaintiff has not satisfied this "quality" component. As discussed above, plaintiff merely questioned and disagreed with UPS's pricing practices and was concerned about the potential legal impact. These type of complaints do not constitute "whistleblowing," *see, e.g., Young v. Schering Corp.,* 275 N.J.Super. at 237, 645 A.2d 1238, particularly where the vague references to potential illegalities are mixed with and, indeed, dwarfed by a potpourri of other unrelated complaints, as they were here. Unlike the archetypal whistleblower case, where the issue to which the whistle is being blown is clear and discrete, it is difficult to see in the forest of complaints the tree that plaintiff maintains should afford him relief.[11] Consequently, the court finds that plaintiff's complaints were not "whistleblowing activities" within the meaning of the Act. It, therefore, follows that plaintiff cannot demonstrate the required nexus between a "whistleblowing activity" and his termination. That is, a plaintiff cannot be terminated for "blowing the whistle" if he did *not* "blow the whistle." *See, e.g., id.* at 235–37, 645 A.2d 1238 ("Although an employee's protection under CEPA is broad, the Act does not cover all employee behavior. Rather, CEPA covers only that behavior which constitutes 'whistle-blowing' as defined by the statute.").

At bottom, CEPA simply does not protect (or guarantee a job to) an employee who is terminated in retaliation for raising an amalgam of complaints about his or her employer's acts if a reasonable person would not consider those acts unlawful. Although CEPA has been described as "the most far reaching 'whistleblower statute' in the nation," *see Mehlman,* 153 N.J. 163, 178, 707 A.2d 1000, 1008 (quoting John H. Dorsey,

*Protecting Whistleblowers,* N.Y. Times, Nov. 2, 1986, § 11 (N.J.) at 34), it is still a "Whistleblower Act," not a "Chronic Complainer Act." This is so even if the purported reason for the employee's termination—here, the violation of an anti-nepotism policy—was pretextual. Indeed, although the court does not so find, a reasonably objective trier of fact presumably could find that plaintiff's termination had nothing to do with his familial relationship with another employee, and that plaintiff was fired for, as he puts it, being a "squeaky wheel" and a "pain in the ass." *Pl.Dep.Tr.* at 901. "Squeaky wheels" and "pains in the ass," however, are not protected classes under the Whistleblower Act.

### III.

For the reasons discussed above, defendants' motion for summary judgment will be granted and the complaint will be dismissed.

### *ORDER*

This matter comes before the court upon the motion of defendants United Parcel Service, Inc. ("UPS") and Patricia Knowles ("Knowles") (collectively "defendants") for summary judgment pursuant to Fed.R.Civ.P. 56(b); and the court having reviewed the submissions of the parties and having heard argument on the motion; and for the reasons discussed in this court's opinion of even date;

IT IS on this 28th day of April, 1998,

ORDERED that defendants' motion for summary judgment will be granted and the complaint will be dismissed.

---

11. Perhaps this explains why even plaintiff did not claim that he was a whistleblower in his complaints to the EEOC and DCR and his statements to his psychiatrist. *See* note 1, *supra.*