

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-7-1999

# Blackburn v. United Parcel Ser

Precedential or Non-Precedential:

Docket 98-6075

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Blackburn v. United Parcel Ser" (1999). *1999 Decisions*. Paper 149.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/149

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 7, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-6075

BENJAMIN BLACKBURN,
      Appellant

v.

UNITED PARCEL SERVICE, Inc.;
PATRICIA KNOWLES

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 95-cv-04709)
District Judge: Honorable Maryanne Trump Barry

Argued: February 9, 1999

Before: BECKER, Chief Judge, McKEE, Circuit Judges
and LEE, District Judge.*

(Filed June 7, 1999)

       WALTER A. LUCAS, ESQUIRE
        (ARGUED)
       GLEN D. SAVITS, ESQUIRE
       LISA NEMETH, ESQUIRE
       Lucas, Savits & Marose, LLC
       50 Northfield Avenue
       West Orange, NJ 07052

       Counsel for Appellant

_____

*Honorable Donald J. Lee, United States District Judge for the Western
District of Pennsylvania, sitting by designation.

KATHLEEN M. McKENNA, ESQUIRE
 (ARGUED)
DAVID W. MacGREGOR, ESQUIRE
Proskauer, Rose, LLP
1373 Broad Street
P.O. Box 4444
Clifton, NJ 07105-4444

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

In this diversity case, we are asked to review the District Court's grant of summary judgment for defendant United Parcel Service ("UPS"), which was grounded on the view that the conduct of plaintiff Benjamin Blackburn did not constitute protected activity under the New Jersey "whistleblower" statute, the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. SS 34:19-1 to -8. Being doubtful of the correctness of this conclusion of the District Court, we will assume that Blackburn has met his burden of establishing a prima facie case of retaliation under CEPA. We will instead affirm the District Court's judgment on the alternative ground that Blackburn has failed to offer sufficient admissible evidence to rebut UPS's proffered legitimate justification for his discharge--his putative violation of UPS's anti-nepotism, favoritism, integrity, and accountability policies. In order to reach the pretext issue, and so as to determine which evidence of Blackburn's might be admissible at trial, we must consider the contours of a number of exceptions to the rule against admitting hearsay evidence. In particular, we must interpret the seldom-invoked exception for reputation evidence concerning family relationships, see Fed. R. Evid. 803(19), which bears on Blackburn's defense to the nepotism charges. Ultimately, we conclude that an insufficient quantum of evidence would be admissible at trial to rebut UPS's proffered legitimate justification for discharging Blackburn; hence, we affirm.

I. Facts & Procedural History

Blackburn worked for UPS1 for approximately eight years. He began work as a driver in June 1986, and was promoted several times, first becoming a manager in 1990. In early 1992, Blackburn was transferred to a division of the company that priced UPS products and services. His duties included development of a flexible pricing project, the Incentive Administration System ("IAS"). In September 1993, he was promoted to Marketing User Representative for the Marketing Information Group in Mahwah, New Jersey. In this position, his responsibilities included addressing, through the IAS or otherwise, UPS's loss of accounts and significant amounts of business to a competitor, Roadway Package Service. His principal supervisor at that time was Gary Hopwood, who was based in Atlanta. Hopwood's supervisor was Nicholas Bain, who was also Atlanta-based.

A. Blackburn's Complaints to His Supervisors

In November 1993, Blackburn first expressed to the IAS project manager, Rich Cooley, his concerns regarding possible antitrust violations arising out of customer discounts given through the IAS.2 Blackburn's concerns allegedly intensified when, in early 1994, UPS began to modify its pricing system and combined ground contracts with air contracts, a "bundling" practice that he alleged

_____

1. Also named as a defendant was Patricia Knowles, a supervisor in UPS's Human Resources Department. The District Court found that there was no basis for any claims against Knowles and dismissed her from the suit. Blackburn does not appear to contest this ruling, focusing his discussion on his claims against UPS. We likewise will confine our discussion to the issues concerning UPS, and therefore refer to the singular defendant throughout.

2. In this appeal from summary judgment in favor of defendant, "we view the facts as they are set forth [in the record], in the light most favorable
to the non-moving party [i.e., Blackburn], in order to determine whether there are material issues of disputed fact." Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989). References in this opinion to "App." refer to Blackburn's Appendix, while references to "S.A." refer to the Supplemental Appendix filed by UPS.

3

allowed even unprofitable ground customers to be enticed with air discounts. Blackburn believed that the IAS project was generally falling apart because of inadequate resources and a lack of management and direction.

On March 22, 1994, Blackburn first put his concerns in writing, sending a memo to his supervisor, Hopwood. This memo stated, in relevant part:

> As per our recent phone conversation, I'm detailing here areas where I believe that we may run into significant problems with respect to Anti-Trust issues going forward.
>
> I would appreciate your running these by [UPS in-house attorney] Joel Creamer in order to determine whether these issues will present legal obstacles.
>
> 1) No security check exists at present to authenticate or assure that the information entered by field users is either accurate or valid. As you know, it is important that user information be subject to some type of validation process or, the worst case scenario, we may be providing a discount level that could easily be interpreted as predatory in nature.
>
> While I am unsure as to the extent of our obligation in this area, it seems to me that we must have some type of system in place that will authenticate, to some reasonable degree, the input data that our sales reps are entering in order to develop prices. To leave this to their discretion is, I believe, flirting with disaster under the present scenario.
>
> Obviously, Creamer will have a much better sense about the company's obligation here but to expound upon my concern a bit more, it occurs to me that a challenge to our pricing methodology cannot be defended merely by the company taking the position that it didn't know what its sales reps were doing in developing discounts. That is to say, it is difficult for me to see where a posture of "see no evil, hear no evil . . ." is especially wise given our current position in the Ground marketplace. I urge you to take action to determine whether this [is] as significant as I fear it may be down the road.

2) The present combination of Mark Matulavicus and Leslie Gilstrap working as representatives of the Strategic Cost groups causes me grave concerns as I have been unable, as you know, to get any real commitment from their manager as to the level of comfort we should have in determining whether their costing methodology is indeed in line with regularly accepted costing practices or whether the Incentive Administration System is intended to be built using trial methodology.

App. at 60 (ellipsis in original).

On April 18, 1994, Blackburn sent another memo to Hopwood about his discomfort with the status of IAS. He suggested that it could not be properly validated and that there were many internal failures, including the improper billing of hundreds of customers. He expressed concern that releasing IAS to customers in its present state could cause "significant" liability, and "we ought to try and get things straightened out before we end up having to explain ourselves to someone outside of our organization." Id. at 62. On June 3, 1994, Blackburn wrote to Bain, expressing the view that the IAS project "will have gravely negative implications for the organization. . . . Both Rich Cooley and I have serious reservations as to whether the system we are building is indeed functioning properly and the potential outcome of this may be significant both internally and externally." Id. at 63.

On June 15, 1994, Blackburn wrote another memo to Hopwood, stating that "I have serious concerns about the rate we are moving and what I believe to be the gross negligence of our group in assuring that the system works properly and, dare I say, within the confines of ordinary accepted business principles." Id. at 64. He could not "in good conscience" sign off on the system without reasonable testing:

Our billing problems have, I believe, only beg[u]n to show themselves for what they truly will be come yet another release of the system and I am extremely uncomfortable with the idea of signing off on something that is not only wrong but very likely illegal in the way that it is used.

5

You have indicated to me that I should "relax" about this and stated that the issues are too complex for ordinary folks to understand. I must say that while I agree that the issues are indeed complex, it won't take a rocket scientist to figure out that the methodology we've used in creating this system lacks a basic integrity that is at the core of any worthwhile endeavor. I fear that the result will not only be a loss of confidence by our customers but also willingly and knowingly violates fundamental obligations we have as an organization to our fellow employees, our customers and the public.

It certainly wouldn't take a genius to pick apart the cost model as it stands at present and I suspect that we could easily find glaring departures from commonly accepted costing practices. . . .

Last but not least, I believe strongly that any challenge to the practices in place would not stand a legal litmus test. For this reason, I urge you on this count to not only discuss the implications of this with the legal staff but to also take another crack at making the Strategic Costing group aware of the potential impact should additional qualified resources not be assigned to work on the project.

Id. at 64–65. Blackburn sent a final memo to Hopwood on August 12, 1994:

Yesterday we had [a meeting] at your request. I've written up the following summarization in order to highlight the key points of what became a very disturbing discussion.

. . . In reviewing my performance, you indicated that I am performing at a very high level technically . .. . You also indicated that you feel I need to improve in the area of "being a team player".

As you stated, your concern regards my continued criticism of the methodology used in IAS to apply pricing formulas which may violate Anti-Trust regulations.

. . . .

6

I believe that I have an obligation to raise these concerns and your demand that I "not discuss these with others" is especially difficult in light of the fact that my concerns have been on-going for some time.

. . . .

You have agreed on numerous occasions with both Pat Toomey and myself that this situation must be corrected immediately if we are to avoid a significant set of legal problems going forward. . . .

. . . I must nevertheless continue to remind you of our obligation to assure proper pricing practices in light of our role as the marketplace leader in the ground segment.

As I have mentioned to you numerous times, the stress that this subject has caused me is tremendous and has been instrumental in the development of serious health problems that originally led me to request a transfer from the Marketing Information group.

While I believe that I have been a solid "team player" throughout my career, I am deeply bothered by your clear message that my success on this project depends more on my willingness to [toe] a line of silence amid seriously questionable and unethical pricing and management practices than on traditional measures of accountability.

Your references to me as an "unimaginative stick in the mud", a "snitch" and most interestingly, as a "nosy, bean counting Jew" are unwanted, embarrassing and frankly, unprofessional.

Id. at 66-67.

Blackburn was fired by UPS on September 29, 1994, approximately seven weeks after his last memo was sent to Hopwood. He alleges that he was fired for raising with his supervisors the possible illegality of UPS's pricing system, and that his firing violates CEPA.

7

B. UPS's Stated Reason for Blackburn's Firing

The position of UPS is twofold. First, it asserts that Blackburn's conduct in complaining to his superiors about problems with the IAS did not constitute protected activity under CEPA. Second, UPS contends that Blackburn was fired not for his complaints regarding the IAS, but for violations of UPS's anti-nepotism, favoritism, integrity, and accountability policies.

UPS has had an anti-nepotism policy in its Policy Book for management employees since 1965. The 1992 version, in effect during the period in question, states:

> We Strictly Limit the Employment of Relatives. .. .
>
> . . . .
>
> . . . [W]e prohibit hiring--for either full-time or part-time employment--relatives of active employees . .. .
>
> For the same reasons, we discourage continuation of the full-time or part-time employment of any employee who marries another employee while either person holds a management position in the same district, the same region office or Corporate Headquarters.

S.A. at 118. The Policy Book does not define "relatives." The favoritism policy states, "We Treat Our People Fairly and Without Favoritism. . . . We have the responsibility to avoid any relationship that may result in actual or perceived favoritism." Id. at 123. The integrity policy states:

> We Insist Upon Integrity in Our People. . . .
>
> . . . We insist on integrity in the preparation and approval of all reports.
>
> We expect our people to be honest with respect to intangible things as well--in the time, effort, and full performance of their jobs; in fair play in dealing with others; and in the acknowledgment of mistakes or other shortcomings.
>
> . . . [W]hen we do discover a dishonest person in our organization, we deal with that individual quickly and firmly.

8

Id. at 134. Finally, the accountability policy states:

> We Are All Accountable for Compliance With Our Policies. As individuals, we do not have the authority to change or disregard any of our company's policies. We are expected to follow existing policies, even if not always in complete agreement with them. We must be careful not to misinterpret or violate a policy's spirit and intent. If in doubt, we should check with others for guidance.
>
> . . . .
>
> Our managers and supervisors set the example for carrying out our policies. . . . They, therefore, are expected to lead the way for other UPS people--by word and action--in living up to our policies.

Id. at 110. As a management employee, Blackburn received a copy of the Policy Book and was aware of these policies.

Blackburn married Loren Morrissey in April of 1990. On September 29, 1993, Linda Shepard, Morrissey's sister, applied for a job at UPS's Mahwah facility. Shepard stated on her employment application that she did not have any relatives employed by UPS. In December of 1993, Shepard was hired as a Methods Analyst at Mahwah, and began work in the same building as Blackburn. Blackburn was aware that Shepard had applied for and gotten the job, and at times commuted to work with Shepard and had contact with her during the workday by, for example, meeting her for lunch. At no time before September 1994 did Blackburn disclose his relationship with Shepard to UPS. See id. at 14 (Pl.'s Dep. at 182-83). At various times after Shepard's hiring, and before September 1994, Blackburn recommended Shepard for other UPS positions without informing those to whom he made the recommendations that Shepard was his sister-in-law.

On September 14, 1994, UPS's Loss Prevention Department received an anonymous complaint, forwarded to Patricia Knowles of UPS's Human Resources Department at Mahwah, that Blackburn was Shepard's brother-in-law. The complaint also expressed concern that Shepard might be promoted because of Blackburn's influence. That same

9

day, Knowles and UPS manager Nigel Watson met with Shepard and questioned her regarding her relationship with Blackburn. After initially denying that Blackburn was her brother-in-law, Shepard eventually admitted that he was married to her sister. However, she gave an incorrect date for Blackburn's marriage to her sister, claiming that they were married in April 1994, after Shepard had been hired by UPS.

After verifying the actual date of Blackburn's marriage (through UPS's Human Resources Department in Atlanta), Knowles confronted Blackburn on September 15, 1994. Blackburn denied that he was "related" to Shepard but admitted that he was married to her sister. He also expressed disbelief that the relationship was of concern to UPS. On September 16, Knowles met again with Shepard, who claimed that Blackburn was aware that Shepard was interviewing with UPS when she originally sought a job there. On September 29, 1994, UPS offered Shepard a chance to resign, on the grounds that she had lied on her application (by indicating that she was not related to anyone at UPS) and had lied to Knowles when confronted with this information. Shepard resigned on September 30, 1994.

Also in September, Blackburn's supervisor, Hopwood, was informed of the events surrounding Shepard's hiring and her relationship to Blackburn. Hopwood spoke with Blackburn and, upon learning the identity of Blackburn's sister-in-law, realized that she was the person Blackburn had recommended to him and another manager for openings in the department without informing them that she was his sister-in-law. Blackburn allegedly refused to acknowledge that his conduct was inappropriate, and told Hopkins that UPS would regret it if it pursued the matter.

On September 29, 1994, Hopwood's supervisor Bain and Human Resources manager James Daniels met with Blackburn, who stated that he was not "related" to Shepard but that he was her brother-in-law. He denied any misconduct in permitting her to be hired, recommending her for positions without revealing the nature of their relationship, and claiming not to be related to her. Bain advised Blackburn that he had violated the anti-nepotism

10

policy and the policies on favoritism, integrity, and accountability. That day, after consultation with Daniels and two Human Resources coordinators, Bain fired Blackburn.

C. The Ensuing Litigation

In August 1995, Blackburn filed suit in New Jersey state court, claiming that UPS had fired him in violation of CEPA, and seeking compensatory and punitive damages, attorneys' fees, costs, and such other relief as the court might provide. UPS removed the case to the District Court for the District of New Jersey on the basis of diversity jurisdiction. See 28 U.S.C. S 1332. 3 Following discovery, UPS moved for summary judgment under Federal Rule of Civil Procedure 56(b).

The District Court found that Blackburn's conduct was not covered by CEPA, and it therefore granted summary judgment for UPS. See Blackburn v. United Parcel Serv., Inc., 3 F. Supp. 2d 504, 514–17 (D.N.J. 1998). The District Court's conclusion that Blackburn's complaints regarding the IAS did not constitute protected activity under CEPA was based on a number of factors. First, the court stated that it "must determine, as a matter of law, whether there

_____

3. Blackburn was a citizen of Connecticut at the time suit was filed. UPS is a citizen of New York. Knowles is a citizen of New Jersey. Therefore, complete diversity exists and subject-matter jurisdiction is proper. However, we note that this case was technically not removable under 28 U.S.C. S 1441 (1994), as a civil action in which jurisdiction is based on diversity of citizenship may be removed "only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." Id.S 1441(b). Here, one of the defendants is a citizen of the state in which the action was brought. Nonetheless, under 28 U.S.C. S 1447(c) (Supp. II 1996), this defect is waived if not raised within 30 days after the notice of removal is filed. No motion to remand having been filed within this period, jurisdiction in the District Court was properly exercised. Cf. Korea Exch. Bank v. Trackwise Sales Corp., 66 F.3d 46, 50–51 (3d Cir. 1995) ("Because removal by a forum defendant in noncompliance with section 1441(b) does not deprive a federal court of subject matter jurisdiction, it is clear under section 1447(c) that this irregularity must be the subject of a motion to remand within 30 days after filing the notice of removal.").

11

exists a clear expression of law, either in a statute or rule or in a regulation promulgated pursuant to a statute, that `would be violated if the facts as alleged are true.' " Id. at 514 (citation and emphasis omitted). It then held that Blackburn had not provided the court "with a scintilla of evidence . . . that would permit [the] court to conclude, as a matter of law, that any antitrust law would be violated if the facts, as described by plaintiff, were true." Id. The court found instead that Blackburn had only complained to his supervisors "that a law might someday be violated if certain precautions [were] not taken or certain changes [were] not made," and that this complaint about potential future violations of the law was not covered by CEPA. Id.

The court also held that no reasonable trier of fact could find that Blackburn reasonably believed that the conduct he complained of to his supervisor violated the antitrust laws. See id. at 515. The court found that all of the evidence, even viewed in a light most favorable to Blackburn, demonstrated that he "merely questioned and disagreed with UPS's pricing practices and was concerned about the potential legal impact." Id. at 517. It concluded that "[t]hese type of complaints do not constitute `whistleblowing,' particularly where the vague references to potential illegalities are mixed with and, indeed, dwarfed by a potpourri of other unrelated complaints." Id. (citation omitted). For these reasons, the court granted UPS's motion for summary judgment. The District Court did not reach the pretext issue on which we base our decision, finding that a genuine issue of material fact existed regarding UPS's claimed reason for firing Blackburn. See id. at 508 n.2.

Blackburn filed a timely notice of appeal. We have jurisdiction to hear the appeal under 28 U.S.C. S 1291. We exercise plenary review over a grant of summary judgment, "construing all evidence and resolving all doubts raised by affidavits, depositions, answers to interrogatories, and admissions on file in favor of the non-moving party." Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

12

II. The New Jersey Conscientious Employee
       Protection Act

A. Introduction

The New Jersey Conscientious Employee Protection Act,
enacted in 1986, provides in relevant part:

     An employer shall not take any retaliatory action
     against an employee because the employee does any of
     the following:

     a. Discloses, or threatens to disclose to a supervisor
     or to a public body an activity, policy or practice of the
     employer . . . that the employee reasonably believes is
     in violation of a law, or a rule or regulation
     promulgated pursuant to law . . .;

      . . . .

     c. Objects to, or refuses to participate in any activity,
     policy or practice which the employee reasonably
     believes:

     (1) is in violation of a law, or a rule or regulation
     promulgated pursuant to law . . .;

     (2) is fraudulent or criminal; or

     (3) is incompatible with a clear mandate of public
     policy concerning the public health, safety or welfare or
     protection of the environment.

N.J. Stat. Ann. S 34:19-3 (1988 & Supp. 1999)."Retaliatory
action" includes discharge, suspension, demotion, or other
adverse action involving an employee's terms and
conditions of employment. See id. S 34:19-2(e).

The New Jersey courts have repeatedly held that CEPA
was enacted "to protect employees from retaliatory actions
by employers," Abbamont v. Piscataway Township Bd. of
Educ., 650 A.2d 958, 964 (N.J. 1994), and that it is
"remedial legislation" that should be liberally construed to
effectuate the legislature's protective intent, see Young v.
Schering Corp., 660 A.2d 1153, 1158 (N.J. 1995); see also
Barratt v. Cushman & Wakefield, Inc., 675 A.2d 1094, 1098
(N.J. 1996) ("[C]ourts should construe CEPA liberally to

13

achieve its remedial purpose."). Like the New Jersey Law Against Discrimination ("LAD"), CEPA "seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers." Abbamont, 650 A.2d at 964. In interpreting CEPA's various provisions, New Jersey courts have held that its protections should be construed broadly and its exceptions and limitations read narrowly:

> The words used may be expanded or limited according to the manifest reason and obvious purpose of the law. . . . The language is not to be given a rigid interpretation when it is apparent that such meaning was not intended. The rule of strict construction cannot be allowed to defeat the evident legislative design.

Crusco v. Oakland Care Ctr., Inc., 702 A.2d 1363, 1367 (N.J. Super. Ct. App. Div. 1997) (internal quotation omitted).

B. Elements of a CEPA Case

Our analysis of a retaliatory discharge claim under CEPA is similar to our analysis of a retaliation claim under federal discrimination law. Cf. Velantzas v. Colgate-Palmolive Co., 536 A.2d 237, 238 n.1 (N.J. 1988) (citing federal court decisions on retaliatory discharge in a case arising under New Jersey law); Kolb v. Burns, 727 A.2d 525, 530-31 (N.J. Super. Ct. App. Div. 1999) (adopting the federal court analysis of retaliation claims "as legally sound and consistent with New Jersey's general treatment of claims asserted under anti-discrimination [legislation]"). First, the plaintiff must make out a prima facie case of retaliatory discharge. The court in Kolb held that a CEPA plaintiff must demonstrate four elements to meet this initial burden:

> (1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed whistle-blowing activity described in [CEPA]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists

14

> between the whistle-blowing activity and the adverse
> employment action.

Id. at 530; see also Young v. Schering Corp., 645 A.2d 1238, 1244 (N.J. Super. Ct. App. Div. 1994) [Young I] (listing two elements for prima facie case: a " `belief that illegal conduct was occurring [that] had an objectively reasonable basis in fact' " and an adverse employment action that was causally connected to the plaintiff's disclosure or threatened disclosure of the illegal conduct to a supervisor or public body (citation omitted)), aff'd, 660 A.2d 1153 (N.J. 1995); cf. Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (holding that a plaintiff in a federal retaliation case "must show 1) that she engaged in protected activity, 2) that the employer took adverse action against her, and 3) that a causal link exists between the protected activity and the employer's adverse action").

In addition to the prima facie case, the well-established burden-shifting analysis that is used in federal discrimination cases involving "pretext" claims is appropriately used in a CEPA case. See Kolb, 727 A.2d at 530-31 (outlining the burden-shifting analysis under Title VII and LAD). Once the plaintiff meets his prima facie burden, "the burden of production shifts to the defendant to `articulate some legitimate, nondiscriminatory reason' for its actions." Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir.) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)), cert. denied, 118 S. Ct. 299 (1997). Once the defendant articulates a legitimate reason for the adverse employment action, the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the plaintiff. See id. Then, "[t]o prevail at trial, the plaintiff must convince the factfinder `both that the reason [given by the employer] was false, and that [retaliation] was the real reason.' " Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis omitted)).

For summary judgment purposes, the court must determine whether the plaintiff has offered sufficient evidence for a reasonable jury to find that the employer's proffered reason for the discharge was pretextual and that retaliation for the whistleblowing was the real reason for

15

the discharge. See Sempier v. Johnson & Higgins , 45 F.3d 724, 728 (3d Cir. 1995) ("[T]o defeat a summary judgment motion based on a defendant's proffer of a nondiscriminatory reason, a plaintiff who has made a prima facie showing of discrimination need only point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence."). Typically, the types of evidence that the plaintiff must point to are "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." Id. at 731; see also Kolb , 727 A.2d at 531 (citing Third Circuit Title VII case law regarding plaintiff's burden to show pretext at summary judgment stage).

III. Blackburn's CEPA Claim

A. Prima Facie Case

In this case, the District Court found that Blackburn had failed to make out a prima facie case because he had not shown that he had engaged in protected whistleblowing activity. Given New Jersey case law and the intent of the legislature in enacting CEPA, we have some doubt as to the correctness of the District Court's conclusion on this point.4

_____

4. As noted in the text supra, the District Court relied primarily on the fact that Blackburn had not clearly articulated the precise law that UPS would be violating if its actions were as he alleged, and that he only complained of potential future violations of the law, rather than ongoing violations. We note, however, that New Jersey courts have held that a CEPA plaintiff need not cite "any specific statute, rule or regulation which was allegedly violated" when disclosing employer wrongdoing or even when filing a CEPA action. Regan v. City of New Brunswick, 702 A.2d 523, 528–29 (N.J. Super. Ct. App. Div. 1997). For example, in Mehlman v. Mobil Oil Corp., 707 A.2d 1000 (N.J. 1998), the plaintiff complained about his employer's conduct without being aware of any specific laws, guidelines, or government policies that his employer was violating. The court nonetheless held that "[s]pecific knowledge of the precise source of public policy [allegedly violated] is not required. The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare." Id. at 1015–16.

16

However, rather than engage in a lengthy exegesis on the matter, we will assume that Blackburn presented sufficient evidence to meet his prima facie burden at the summary judgment stage, and will dispose of this appeal on the alternative ground that he has presented insufficient evidence of pretext to survive summary judgment.

_____

Further, while CEPA is not intended to protect chronic complainers or those who simply disagree with their employer's lawful actions, it does protect those persons who disclose their employer's activities when, "given the circumstantial evidence, a reasonable lay person would conclude that illegal activity was going on." Young I, 645 A.2d at 1244 (internal quotation omitted); see also Mehlman v. Mobil Oil Corp., 676 A.2d 1143, 1156 (N.J. Super. Ct. App. Div. 1996) ("The sine qua non of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of a reasonable belief
to the effect that such authority or policy has been breached."), aff'd, 707 A.2d 1000 (N.J. 1998). Finally, the New Jersey Supreme Court has refused to engraft either temporal or geographic limitations onto CEPA claims, holding that disclosure of past violations of law or complaints regarding violations of another nation's laws are both protected under the statute. See Mehlman, 707 A.2d at 1016-17; Barratt, 675 A.2d at 1100 ("CEPA protects more than the disclosure of illegal acts that are ongoing. To require employees to confirm that the illegal conduct was ongoing would inhibit them from reporting that conduct. Disclosure of illegal conduct that is past, moreover, like that of ongoing conduct, can be in the public interest.").

On the other hand, while the New Jersey courts have construed CEPA broadly, it is clear that much of Blackburn's lamentation involved internal disputes over funding and staffing. More importantly, his allegations regarding one of the most complex and difficult-to-prove areas of antitrust law--predatory pricing--are undermined by his patent lack of sophistication in this area. In fact, Blackburn conceded that "all I know about anti-trust is what I've learned at UPS." App. at 53. Despite being liberally construed by the New Jersey courts, CEPA is not intended to shelter every alarmist who disrupts his employer's operations by constantly declaring that illegal activity is afoot--or, as in this case, is
about to be afoot. Therefore, we believe it is a close question whether the
District Court correctly concluded that Blackburn's activity was not protected whistleblowing under the Act, and we decline to reach this difficult issue, as our ultimate decision in this case makes it unnecessary to do so.

17

B. UPS's Stated Reason for the Discharge

UPS's stated reason for firing Blackburn was his violation of the company's anti-nepotism, favoritism, integrity, and accountability policies, which it placed in the record. UPS adduced evidence that Blackburn failed to divulge that Shepard was his relative, and that he recommended her for positions within UPS without disclosing to the relevant decisionmakers that she was his sister-in-law. UPS also offered evidence that it has consistently enforced its anti-nepotism policy, which supports its proffer that Blackburn's violation of this policy was the actual reason he was discharged.5 Indeed, Blackburn himself conceded at his deposition that UPS has regularly enforced the anti-nepotism policy (although, as we detail below, he offers purported examples of the policy's nonenforcement). Therefore, UPS has met its burden of production at the second step of the burden-shifting analysis. See Woodson, 109 F.3d at 920 n.2 ("The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the discharge . . . ."). It is thus incumbent upon Blackburn to offer sufficient admissible evidence that this justification is pretextual and that the real reason that he was fired was for complaining about UPS's possible antitrust violations to survive UPS's motion for summary judgment. In other words, he must show " `weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons.' " Kolb, 727 A.2d at 531 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)).

_____

5. While Blackburn has suggested that the anti-nepotism policy does not apply to his situation because Shepard is not a blood relation, he does not press this point, relying instead on UPS's purported nonenforcement of the policy. However, UPS alleges that Blackburn's conduct also violated its favoritism, integrity, and accountability policies, and he has
offered little evidence in response to this proffer.

18

C. Pretext

1. Blackburn's Evidence

In order to meet his burden, Blackburn must point to admissible evidence in the record "showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In attempting to show that UPS's stated reason for firing him was pretextual, Blackburn claims that he never hid his relationship with Shepard. Rather, he testified that he regularly commuted to and from work with her, entered the building with her each day, often met her for lunch and breaks, displayed a wedding picture prominently on his desk with Shepard in the wedding party, and was otherwise open about the relationship, including the fact that they shared an address. Similarly, Shepard testified that she told colleagues about the relationship and even inquired about it at her initial interview, and nothing was done. Blackburn also testified that he assumed that the prohibition on the hiring of "relatives" included only blood relatives.6

We find the foregoing less than persuasive evidence to support Blackburn's burden, even at summary judgment, of proving that UPS's stated reason was pretextual. The only portion of this evidence that is probative of pretext--i.e., that UPS knew of Blackburn's relationship to Shepard but did nothing about it, and later fired him for his whistleblowing activity under the pretext of its anti-nepotism policy--is Shepard's allegation that, when she applied for a job at UPS, she informed the initial interviewer that her brother-in-law worked for UPS. There is no indication that the decisionmakers who fired Blackburn for his violations of the anti-nepotism and related policies were informed of Shepard's comments at her interview. In fact,

_____

6. Although UPS's policy was less than clear in defining the prohibited relationships, the clarity of the policy or the reasonableness of Blackburn's alleged misreading of the policy are not necessarily relevant to the pretext issue. If the policy actually covered relationships such as Blackburn and Shepard's, and if this (along with the concomitant violations of the other policies) was the real reason that Blackburn was discharged, Blackburn's CEPA case must fail.

19

the record evidence overwhelmingly supports the conclusion that the relevant UPS managers were unaware of Blackburn's relationship with Shepard until the anonymous tip was received in September 1994, at which time immediate action was taken against both Shepard and Blackburn. Cf. Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 201-02 (3d Cir. 1996) (holding that jury could find that employer had retaliatory intent because relevant decisionmakers were aware of plaintiff's discrimination complaints).

Blackburn's stronger argument for pretext--and one that would be sufficient to preclude summary judgment, if supported by adequate admissible evidence--is that UPS did not consistently enforce its anti-nepotism policy, which, according to UPS, was the primary basis for his discharge. If Blackburn has presented admissible evidence that would raise a fact question whether UPS enforced its anti-nepotism policy, it would be for a jury to decide whether UPS's proffered reason for firing him was pretextual. Given our assumption that Blackburn has presented sufficient evidence to meet his prima facie burden under CEPA, we would have to reverse summary judgment in UPS's favor if a fact issue regarding pretext existed.

In support of his pretext argument, Blackburn provides numerous examples of UPS employees who were related to other employees yet allegedly were not disciplined or terminated for this apparent violation of the anti-nepotism policy. His examples include brothers-in-law, siblings, spouses, uncles and nephews, fathers and sons, and intimate relationships between employees who were dating or living together. UPS responds with evidence that, within the last five years, twenty-nine people at Mahwah left UPS in accordance with the anti-nepotism policy, and that no exceptions currently exist there.

In order to resolve this issue, we must first determine whether any of Blackburn's evidence in this regard is admissible, based as it is on hearsay and, in some instances, multiple hearsay. See Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (noting that a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment

20

motion). Then, we must determine whether the hearsay evidence that might be admissible at trial is sufficient to defeat UPS's summary judgment motion or whether judgment was properly entered in favor of UPS. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

Blackburn's testimony regarding UPS employees he believes to be related includes the following. We take the descriptions of these allegedly related persons from Blackburn's appellate briefs, see Appellant's Br. at 16-17; Suppl. Br. at 1-3, with citations to the place in the record in which the evidence is presented:

> (1) Bill and Tim Jawor, a father and son (App. at 109);

> (2) Jackie and Sal Biancardi, a married couple who work at the UPS facility in Morristown (id.);

> (3) Larry Zileski and Mr. Manzi, brothers-in-law (id. at 95);

> (4) Barry Graziano and Tim Krill, relation not identified (id. at 96);

> (5) Steve Collamore and Eileen O'Connor, husband and wife (id. at 97);

> (6) an uncle and nephew working together at a UPS facility in Parsippany (id. at 103-04);

> (7) two brothers in New York (id.);

> (8) Mark Hopkins and his wife, Beth (id. at 97);

> (9) Bill and Art Weyrauch, brothers (id. at 96-97);

> (10) Don McKenny and Vern Cormie, relation not identified (id. at 97);

> (11) Joe Rossano, Jack Davies, and Joe Reynolds, relation not identified (id.);

> (12) Lorrain Curley and Dan Grace, relation not identified (id.);

> (13) Karen Montemarano and another driver in a Yorktown, New York, UPS facility (id.);

21

(14) Kathleen Jewell and someone else, relation not identified (id. at 101); and

(15) Howard Kaufman and "Mindy," in the Mt. Vernon facility (id. at 101–02).

Blackburn has no personal knowledge of any of the alleged relationships listed above. See Fed. R. Evid. 602. Rather, he testified in his deposition that he was told of these relationships by other persons. The alleged relationships are offered for their own truth. Therefore, Blackburn's information is based on hearsay, see Fed. R. Evid. 801(c), and in some cases on multiple hearsay, so that it must fall within an exception to the rule against hearsay to be admissible. See Fed. R. Evid. 802 (providing that hearsay is not admissible unless it falls under a particular exception); Fed. R. Evid. 805 (providing that multiple hearsay is admissible "if each part of the combined statements conforms with an exception to the hearsay rule").

When asked by us to comment on the admissibility of his pretext evidence, and in particular on the applicability of Federal Rule of Evidence 803(19), Blackburn responded that this evidence was admissible as admissions by a party-opponent, Fed. R. Evid. 801(d)(2)(A), admissions by a party-opponent's agent, Fed. R. Evid. 801(d)(2)(D), statements against interest, Fed. R. Evid. 804(b)(3), or reputation evidence concerning family history, Fed. R. Evid. 803(19). We consider the first, second, and fourth of these contentions below. We dismiss as without merit Blackburn's attempt to admit any of the evidence he has presented under the exception for statements against interest. Not only do we find the contention that the particular statements at issue were "against interest" to be baseless within the meaning of the Rule,[7] but there is no

_____

7. A statement is against interest when it "is so far contrary to [the declarant's] pecuniary, proprietary or penal interest that `a reasonable person in the declarant's position would not have made the statement unless believing it to be true.' " United States v. Boyce, 849 F.2d 833, 836 (3d Cir. 1988) (quoting Fed. R. Evid. 804(b)(3)). Blackburn has offered no evidence that unavailable declarants made "statements which are damaging to themselves," Fed. R. Evid. 804(b)(3) advisory committee's note, so as to come under the exception in the Rule.

22

indication that the hearsay declarants are unavailable, as required by Rule 804.

## 2. Rule 801(d)(2)(A): Admissions by Party-Opponent

Under Rule 801(d)(2)(A), a statement offered against a party is not hearsay if it is the party's own statement. Blackburn claims that the first two relationships listed above fall within the terms of Rule 801(d)(2)(A), because these relationships were identified by defendant Patricia Knowles at her deposition. Admissions by a party-opponent need not be based on personal knowledge to be admitted under Rule 801(d)(2). See United States v. Ammar, 714 F.2d 238, 254 (3d Cir. 1983). Therefore, we need not be concerned here that the basis for Knowles's statement is likely hearsay--i.e., she was told by someone (or discerned from a written document) that Bill and Tim Jawor were father and son, and that Jackie and Sal Biancardi were married--which would ordinarily require an additional exception to make her statements admissible. See Fed. R. Evid. 805.

Although these statements are admissible as admissions by a party-opponent,[8] only one is arguably relevant to the pretext issue. Knowles testified that the Jawors worked at UPS in 1973, more than twenty years before Blackburn was fired and before UPS's current anti-nepotism policy was in force. We therefore find the testimony regarding the Jawors immaterial to the pretext issue.[9] On the other hand,

_____

8. We note, however, that the statements by Knowles might be more appropriately admitted under Rule 801(d)(2)(D), as statements of an agent concerning a matter within the scope of her agency, as Knowles is technically no longer a party to this case. Further, if the statements were
admissible under Rule 801(d)(2)(D), they would be admissible against UPS, while the statements would be admissible under Rule 801(d)(2)(A), if at all, only against Knowles.

9. Although he appears to have abandoned his reliance on it, Blackburn's initial testimony regarding two sets of brothers--the Caseys and the Oberkotters--is indicative of the lack of relevance of much of his pretext evidence. Both of these sets of brothers worked for UPS in the 1920s, many decades before the company established its current anti-nepotism policy.

Knowles testified that the Biancardis remain UPS employees, Jackie as an administrative assistant and Sal as a driver. This could therefore be probative evidence in support of Blackburn's pretext argument. However, the anti-nepotism policy prohibits only the hiring of related persons, and the continued employment of persons who marry while working for UPS when one of them is a management employee. The Biancardis reportedly were married after both had begun working for UPS, and neither holds a management position, so their continued employment does not appear to come within the prohibitions of the anti-nepotism policy.

3. Rule 801(d)(2)(D): Admissions by
      Party-Opponent's Agent

Blackburn argues that testimony regarding the relationships of Larry Zileski and Mr. Manzi; Barry Graziano and Tim Krill; Steve Collamore and Eileen O'Connor; the unnamed uncle and nephew working together at the UPS facility in Parsippany; and the unnamed brothers in New York, are all admissible as admissions by UPS's employees, under Rule 801(d)(2)(D). Blackburn reads the Rule much too broadly, however, and fails to establish that most of these statements were made by UPS's agents or employees "concerning a matter within the scope of the agency or employment." Fed. R. Evid. 801(d)(2)(D). We discuss each alleged relationship in turn.

First, Blackburn testified that a UPS employee, John Cipriani, informed him that UPS employees Larry Zileski and a Mr. Manzi were brothers-in-law. Cipriani's position is not identified, however, and there is no indication that the statement was made concerning a matter within the scope of Cipriani's agency or employment with UPS.[10] Blackburn testified that Zileski himself told Blackburn that Manzi was his brother-in-law. This statement too is inadmissible hearsay under Rule 801(d)(2)(D). Although Zileski may be able to so testify on the basis of Rule 803(19), see infra,

_____

10. It is also clear that Cipriani is not a party-opponent, and there is no
indication that he either is authorized by UPS to speak for it or is its
coconspirator. See Fed. R. Evid. 801(d)(2).

24

there is again no indication that he was speaking for UPS on a matter within the scope of his agency or employment so that Blackburn could testify as to what Zileski told him.[11]

Blackburn testified that UPS Operations Manager Michael Lattari informed him that Graziano and Krill were somehow related. While Lattari may have been speaking about a matter within the scope of his agency or employment, Blackburn has offered no evidence of the actual relationship between Graziano and Krill, whether it was one that was covered by the UPS policy, and whether UPS addressed any violation of the policy by discharging one of the employees. Therefore, while this may be appropriate Rule 801(d)(2)(D) evidence, it would be immaterial to prove that UPS's stated reason for discharging Blackburn was pretextual.

Blackburn testified that Steve Collamore told him that Collamore's wife, Eileen O'Connor, also worked for UPS. However, Blackburn admitted that at some point after they got married, O'Connor left UPS, and there is no indication that they were both allowed to remain at UPS in violation of the anti-nepotism policy. Finally, while Linda Shepard testified that she was told of certain related employees by the person who interviewed her for a job at UPS, these employees are not even identified by name and no testimony was provided as to whether they were disciplined for violating UPS's anti-nepotism policy. We find this evidence plainly inadmissible to prove pretext, both because Blackburn has failed to establish that it is proper Rule 801(d)(2)(D) evidence and because, without more details regarding the alleged relationships and UPS's failure to act on them, they are clearly irrelevant to the pretext issue.

_____

11. Blackburn's testimony about what Zileski told him might be admissible as a "statement concerning the declarant's own . . . relationship by . . . marriage." Fed. R. Evid. 804(b)(4) (hearsay exception
for statements of personal or family history). However, under Rule 804(b), such a statement is admissible only "if the declarant is unavailable as a witness." Here, unless there is some indication in the record that Zileski will be unavailable, Blackburn's statement about what Zileski told him does not fall within an exception to the rule against hearsay.

4. Rule 803(19): Reputation Concerning Personal or
      Family History

As all of Blackburn's evidence that we are considering here involves "personal or family history," the hearsay exception in Rule 803(19) would appear to be a particularly appropriate basis for finding the evidence admissible. The Rule allows for the admission of otherwise excludable hearsay, regardless of the declarant's availability (or lack thereof), when it consists of:

> Reputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history.

Fed. R. Evid. 803(19).

a. Background Principles

The matters of personal and family history that are within the ambit of Rule 803(19) are often difficult to prove through personal knowledge. For example, if a witness has not been present at someone's wedding, or has not personally seen that person's valid marriage license and executed marriage certificate, see, e.g., N.J. Stat. Ann. SS 37:1-2, 37:1-17 (1968 & Supp. 1999), he or she presumably could only testify regarding the marriage on the basis of hearsay. However, "[m]arriage is universally conceded to be a proper subject of proof by evidence of reputation in the community." Fed. R. Evid. 803(19) advisory committee's note. This is no doubt because a well-grounded belief that two persons are married--by those who know them, have attended their family functions, and have regarded them as a married couple--is sufficiently reliable evidence to prove the fact of the marriage. Other matters of personal and family history also "seem to be susceptible to being the subject of well founded repute." Id. That two community members are brothers or that a member of the community is another member's father are likely to be matters that have been discussed within the community and that have become well-established "facts" if

26

no reason has been presented to doubt their truth. Therefore, reputations regarding relationships and other personal and family matters within a well-defined community are considered to have the circumstantial guarantee of trustworthiness that justifies a hearsay exception. See 3 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 1699 (7th ed. 1998) ("[G]eneral reputation about facts of interest to the community is probably trustworthy . . . .").

In applying the Rule 803(19) exception to Blackburn's evidence of relatives working at UPS, we must answer at least two questions. First, does a person's place of work come within the Rule's coverage? And second, what foundation is required for testimony to be admitted under Rule 803(19)? In other words, is Blackburn's evidence sufficiently based on actual "reputation," or is it based on some other, less reliable foundation such as rumor or speculation?

b. Relevant Community for Reputation

On the first question, we believe that Rule 803(19), in referring to "reputation . . . among a person's associates, or in the community," encompasses one's reputation at a place of work. The advisory committee certainly foresaw this application of the exception in Rule 803(19): "The `world' in which the reputation may exist . . . has proved capable of expanding with changing times from the single uncomplicated neighborhood, in which all activities take place, to the multiple and unrelated worlds of work, religious affiliation, and social activity, in each of which a reputation may be generated." Fed. R. Evid. 803(19) advisory committee's note. In the context of reputation evidence of a person's character, "courts have readily extended the concept of community to include the community in which one works, as well as where one lives." United States v. Oliver, 492 F.2d 943, 946 (8th Cir. 1974).12

_____

12. We of course do not decide here whether a witness could testify regarding someone's reputation for good (or bad) character within a work community, cf. Fed. R. Evid. 803(21) (providing a hearsay exception for "[r]eputation of a person's character among associates or in the community"), as this issue is not before us.

27

Both before and since enactment of the Federal Rules, commentators have made the same point. See 5 Wigmore on Evidence S 1616, at 591 (James H. Chadbourn rev. 1974) ("The traditional requirement about `neighborhood' reputation was appropriate to the conditions of the time; but it should not be taken as imposing arbitrary limitations not appropriate in other times."); 5 Weinstein's Federal Evidence S 803.24[2] (Joseph M. McLaughlin ed., 2d ed. 1999) ("Allowing such proof [under Rule 803(19)] to come from `associates' reflects the fact that nowadays a person's reputation may no longer exclusively be found in the place where the person lives, but frequently can only be ascertained from coparticipants in the varied activities that make up a modern person's world.").

c. Trustworthiness of Reputation Evidence Concerning Family History; Foundational Requirements

As for the basis of the reputation evidence regarding relationships within a workplace, we find little guidance in the sparse case law surrounding Rule 803(19).13 We believe, however, that the principle behind admitting such evidence despite its hearsay origin--i.e., "that general reputation about facts of interest to the community is probably trustworthy," Saltzburg et al., supra, at 1699--requires that a proponent of Rule 803(19) evidence establish that the reputation testimony arises from sufficient inquiry and discussion among persons with personal knowledge of the

_____

13. This court has cited Rule 803(19) in holding that a witness's testimony regarding her own age "can be considered reputation concerning personal or family history, for which an exception has been made to the hearsay rule under the Federal Rules of Evidence." Government of V.I. v. Joseph, 765 F.2d 394, 397 n.5 (3d Cir. 1985). A district court within our circuit has held that family members' statements that a particular person lived with the plaintiff, supported her financially, and held her out as his child, were admissible under Rule 803(19) in a proceeding to determine if the plaintiff was the person's child. See McBride v. Heckler, 619 F. Supp. 1554, 1561-62 (D.N.J. 1985). More recently, the Second Circuit invoked the Rule to find that testimony by a criminal defendant's father regarding his belief as to where the defendant was born was admissible. See United States v. Jean-Baptiste, 166 F.3d 102, 110 (2d Cir. 1999).

28

matter to constitute a trustworthy "reputation." Rumors and speculation are clearly insufficient in this regard. Testimony by a declarant that he heard, from some unknown source, that two people were related in some way would be inadmissible under Rule 803(19). Rather, what is required is the laying of a foundation of knowledge grounded in inquiry, discussion, interactions, or familiarity "among a person's associates, or in the community" in which he works.

We find support for our reading of the Rule in a number of places. In discussing the rationale behind the Rule, Weinstein notes that "it is likely that these matters have been sufficiently inquired about and discussed with persons having personal knowledge so that a trustworthy consensus has been reached." Weinstein's Federal Evidence, supra, S 803.24[1]. Weinstein continues:

> Before a witness can testify to reputation, the witness must be qualified by showing membership in a group that could have been familiar with the personal or family history of the person in question, namely, family, associates or community. . . . The judge should consider . . . not only the foundation that has been laid for the reception of this reputation evidence, but also such factors as the significance and nature of the fact towards which the proof is directed, the availability of other evidence, and the nature of the litigation.

Id. S 803.24[3] (footnote omitted). In discussing the similar hearsay exception in Rule 803(20), for reputation concerning boundaries or general history, Saltzburg explains:

> [I]t is considered unlikely that a falsehood could become generally accepted as truth in the community, where the matter is of importance to the community.
>
> . . . [T]he testimony must report a general consensus in the community, an assertion of the group as opposed to one or a few of its constituents. The fact that the information has been considered by and was subject to the general scrutiny of the community is an essential guarantee of reliability for the exception.

29

Saltzburg et al., supra, at 1699. As these comments indicate, when a matter has been sufficiently discussed within a well-defined community so that its truth has obtained "circumstantial guarantees of trustworthiness," Fed. R. Evid. 807, it is properly the subject of reputation testimony.

We find further support for our interpretation of the requirements of Rule 803(19) in the more extensive discussion of the required foundation for testimony regarding character reputation. See Fed. R. Evid. 404(a), 405(a), 803(21). We acknowledge that reputation about someone's character and reputation of family relationships are, in many ways, very different concepts. The first might be thought of as a collective community opinion, while the second involves a factual issue. Both, however, require a foundation that is trustworthy and a well-defined "community" that is capable of, in a figurative sense, forming an opinion or discerning a fact. Cf. Webster's Third New International Dictionary 1929 (1966) (defining reputation as "a particular character in popular estimation or ascription"). We therefore find persuasive those authorities that have discussed the foundation that must be laid before a witness may testify about the community's opinion of someone.

The leading case in this area predates the Federal Rules of Evidence, but is helpful nonetheless. In Michelson v. United States, 335 U.S. 469 (1948), the Supreme Court discussed character evidence in the context of a criminal trial. It noted that a witness who testifies about a defendant's character is "allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself." Id. at 477. The Court limited this rule, however: "[T]he witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." Id. at 478.

In a pre-Federal Rules case applying the hearsay exception we are considering here (for reputation of family

matters), the Ninth Circuit reiterated the Supreme Court's point in Michelson:

> It is not every statement or tradition in the family that can be admitted in evidence. The tradition must be from persons having such a connection with the party to whom it relates, that it is natural and likely, from their domestic habits and connections, that they are speaking the truth, and that they could not be mistaken.

Young Ah Chor v. Dulles, 270 F.2d 338, 344 (9th Cir. 1959) (internal quotations omitted). In Whiting v. United States, 296 F.2d 512 (1st Cir. 1961), government witnesses had testified at a criminal trial regarding the defendant's reputation on the basis of hearsay of unknown origin. The court of appeals vacated the conviction, finding the testimony to be inadmissible, as "there must be some demonstrable basis evincing the competence of the witness to give his opinion" about the defendant's character. Id. at 517. While we have held that a witness need not know the defendant personally in order to testify about his character, we have found it sufficient if the witness "knew of [him] and his reputation among the community and the persons making up at least one of the circles which [he] frequented." United States v. Neff, 475 F.2d 861, 863 (3d Cir. 1973).

From these cases, we discern a clear principle: A witness who wishes to testify about someone's reputation within a community must demonstrate that he or she knows of the person and is truly familiar with the "community" in which the reputation has been formed, and that the basis of the reputation is one that is likely to be reliable. Where the alleged reputation is based on nothing more than rumors of unknown origins, or a single instance of "someone told me so," a proper foundation has not been laid for admitting such evidence under Rule 803(19).14

_____

14. Of course, if each hearsay link in the communication chain falls under some exception, the evidence may be admissible. See Fed. R. Evid. 805. For example, if witness A knows nothing of an individual's reputation, but declarant B, who is qualified under Rule 803(19) to testify thereto, informs A of the individual's relationship, and the statement from B to A falls under some hearsay exception, A's testimony about the individual's relationship would be admissible.

d. Applying Rule 803(19) to Blackburn's Evidence

We must now determine whether any of Blackburn's evidence involving allegedly related persons working at UPS is likely to be admissible under the exception in Rule 803(19). We note preliminarily that our determination that a workplace may constitute a "community" under Rule 803(19) is limited by the requirement that a proponent of such evidence establish a reliable foundation for admitting this hearsay testimony. In other words, allegations regarding relationships at far-flung facilities of a large employer such as UPS almost certainly cannot be admissible as reputation evidence within a community or among one's associates.15 Blackburn has not, in many cases, identified the UPS facility at which allegedly related persons were working. In order to meet his burden of establishing a reliable basis for the alleged reputations he invokes, he would need to identify the "community" in which those reputations exist.16 Because we find that, even without this identification of the appropriate community, most of Blackburn's evidence would be inadmissible--and because, at all events, we conclude that his relevant, possibly admissible evidence is insufficient for him to survive summary judgment--we do not dwell on the shortcomings in his evidence regarding the work location of most of the allegedly related persons he offers.

Blackburn testified that "[i]t was known by myself, certainly, and numerous other people, I presume, that Bill and Art [Weyrauch] were brothers. I believe that it was a regular topic of discussion." App. at 97. Although the requirements we have set forth above regarding admission of such reputation evidence may not be met by Blackburn's testimony, we will assume that upon further development of the background to his allegations, this testimony might

_____

15. UPS currently has 326,800 employees worldwide, and 291,500 in the United States alone, at more than 1700 facilities. See UPS at a Glance (visited June 3, 1999) http://www.ups.com/about/glance.html>.

16. We do note that most of Blackburn's examples appear to concern UPS employees at facilities in Northern New Jersey, which might constitute an adequate community for Rule 803(19) purposes, assuming that they are somehow linked to each other.

be admissible at trial, see Petruzzi's, 998 F.2d at 1234 n.9, and we therefore consider it below in our analysis of whether summary judgment for UPS was properly granted.

As for Don McKenny and Vern Cormie, Blackburn could not state how they were related, and admitted that the basis of his information that they were related was "something that I was told by someone I worked with at UPS sometime before I left the company." App. at 97. This clearly fails to meet the standards we have outlined for reputation evidence under Rule 803(19). Not only does it appear that Blackburn does not know McKenny and Cormie (i.e., he could not identify their alleged relationship), but the source of his information--"something that I was told by someone"--cannot even be identified, let alone measured for its trustworthiness.

The same is true of the alleged relationships between Joe Rossano, Jack Davies, and Joe Reynolds (relationship unknown, and information based on "something that someone told [Blackburn]"); between Lorrain Curley and Dan Grace (source of information unknown); between Karen Montemarano and an unknown driver; between Kathleen Jewell and an unnamed relative ("I just remember that she had a relative of some type working there"); and between Howard Kaufman and "Mindy" ("it was my understanding" that they were related). Each of these cases fails to meet the standard we have established for admitting hearsay evidence under the exception for reputation concerning family matters. In each case, Blackburn does not appear to be familiar with the persons named, fails to identify the community involved, and does not establish any basis, let alone a reliable one, for the information that he is offering. In other words, he has failed demonstrably to identify a reputation concerning family relationships that would bring this testimony within the exception in Rule 803(19).

Finally, while we have held that Blackburn may not testify about what Zileski told him, as this is hearsay not within any exception, see supra note 11, Zileski himself could almost certainly testify at trial that Manzi is his brother-in-law. We will assume that Blackburn's testimony regarding what Zileski told him was effectively a proffer of the testimony that Zileski himself would give at trial, and

33

we therefore treat this as evidence capable of being admitted at trial. However, Blackburn has presented no evidence that UPS knew of Zileski and Manzi's relationship, or that the company knew and did nothing about it. Therefore, this evidence, while potentially admissible under a hearsay exception, is not probative of pretext.

5. Summary Judgment

We conclude that Blackburn's evidence that UPS decisionmakers were aware of his relationship to Shepard, and later fired him for his whistleblowing activity under the pretext of its anti-nepotism policy, is, without more, insufficient to overcome summary judgment. As we have detailed supra Part III.C.2–.4, we find that virtually none of his evidence regarding other UPS employees who were allegedly related would likely be admissible at trial as relevant evidence that falls within a hearsay exception. We must therefore determine whether Blackburn has offered sufficient evidence to create a genuine issue of material fact regarding UPS's stated reason for firing him.

Blackburn concedes that there were numerous instances in which UPS terminated employees who violated its anti-nepotism policy. We have held that only the following pretext evidence might be admissible at trial: Blackburn's testimony that Bill and Art Weyrauch were generally known as brothers among UPS employees, and Shepard's testimony that she informed UPS's interviewer about her relationship to Blackburn. This scintilla of evidence is clearly inadequate to create a genuine issue of material fact on UPS's proffered reason for firing Blackburn. In sum, on this record, we are satisfied that, even assuming that Blackburn has met his prima facie burden under CEPA, he has failed to adequately rebut UPS's proffered reason for his discharge by pointing to sufficient "inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995). The judgment of the District Court will therefore be affirmed.

34

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

35