COURT OF CHANCERY
OF THE
STATE OF DELAWARE

ABIGAIL M. LeGROW
MASTER IN CHANCERY

NEW CASTLE COUNTY COURTHOUSE
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report:  November 12, 2014
Submitted:  September 24, 2014

Richard E. Franta, Esquire
Law Offices
1301 North Harrison Street, #102
Wilmington, DE 19806

Felice Glennon Kerr, Esquire
MacElree Harvey, Ltd.
5721 Kennett Pike
Centreville, DE 19807

      Re:    *IMO the Estate of Zigfrids B. Blums, deceased*
              C.A. No. 7479-ML
              ROW Folio No. 152154

Dear Counsel:

Zigfrids B. Blums (the "Decedent") died without a will, leaving a substantial estate and no readily apparent heirs.  Throughout his lifetime, the Decedent repeatedly told friends he had no living relatives.  An extensive genealogy search by the administrator of the Decedent's estate uncovered two possible heirs.  The lineage of one of those possible heirs is in dispute.  This interesting case traces the journey of one family during the turbulent period of the 1920s-1950s in Latvia, and requires the Court to

consider what constitutes sufficient evidence of ancestry when – as a result of wars and political upheaval – the official record is incomplete.

## FACTUAL BACKGROUND

The Decedent's history largely is undisputed. The Decedent was born on April 25, 1926 in Riga, Latvia,[1] emigrated to this country in August 1951, and became a United States citizen in 1958.[2] The Decedent was employed by Hercules Chemical Co. for 36 years. Although he was married, that marriage ended in divorce in 1963. The Decedent had no children and died in Hockessin, Delaware on September 15, 2011. Although friends occasionally implored him to make a will, the Decedent refused to do so, claiming he had no living relatives and that charity was a "scam."[3]

One of the Decedent's close friends, J. Norman Cahill, was appointed administrator of the estate on November 16, 2011. Mr. Cahill first set about gathering the Decedent's assets, the total value of which exceeded $1.2 million.[4] In connection with those efforts, Mr. Cahill initiated this action with a petition for instructions to permit him to sell the Decedent's real estate in order to preserve the assets while Mr. Cahill

---

[1] Pet'r's Ex. (hereinafter "PX") A; PX 10. The Petitioner's exhibits were assembled in a binder and presented by the administrator during the evidentiary hearing in this matter. As explained below, certain of those exhibits were admitted over hearsay objections raised by the Respondent.
[2] *See In re Estate of Zigfrids Blums*, C.A. No. 7479-ML (Jun. 30, 2014) (TRANSCRIPT) (hereinafter "Tr.") at 8; PX A.
[3] Tr. at 8-10.
[4] *Id.* at 15.

researched possible heirs. That petition was granted and the Decedent's property was sold.[5]

Mr. Cahill then set about searching for heirs. He found no leads in the United States.[6] Upon the suggestion of local genealogy experts, Mr. Cahill placed a death notice in a Latvian newspaper, but omitted any reference to the Decedent's estate or the search for heirs.[7] The death notice provided that additional information about the Decedent was available through Mr. Cahill.

In July 2012, Mr. Cahill received a letter from Vija Putnina ("Vija")[8] indicating that she and her mother had searched for the Decedent for many years after World War II, but had not been successful and believed for decades he was deceased.[9] Vija's first letter sought information about the Decedent's life and his family. In a second letter dated August 23, 2012, Vija stated that her mother, Bronislava Putnina ("Bronislava"), was the Decedent's first cousin and that Vija was his goddaughter, and recounted a family history scarred by World War II and its aftermath.[10] Specifically, Vija recalled that she was born in 1944, that she and Bronislava fled to Germany the same year, and that the family lost touch with the Decedent sometime in 1947 after he was called up for service in the Latvian SS Legion. Vija and Bronislava were repatriated from Czechoslovakia to Latvia in 1951, after which Bronislava was arrested, convicted, and

---

[5] *See In re Estate of Zigfrids Blums*, C.A. No. 7479-ML, Dkt. No. 10.
[6] Tr. at 17.
[7] *Id.* at 18-19; PX G.
[8] Certain individuals' first names are used for the sake of clarity. No disrespect is intended.
[9] PX H.
[10] *Id.*

served 20 years in prison on charges that she was a capitalist.[11]  Vija indicated that the authorities confiscated family records and photos when Bronislava was arrested, and those records were not returned.[12]  In her August 2012 letter, Vija expressed regret that the Decedent had been unable to locate the family during his lifetime.

It was not until October 2012, after Vija became suspicious when Mr. Cahill asked her to obtain various family records in Latvia, that Mr. Cahill explained to Vija that he was searching for possible heirs to the Decedent's estate.  A November 2012 letter from Vija provided additional family information but remained consistent with her earlier histories.[13]  Specifically, Vija explained – and official documents largely support – that the Decedent's grandparents, Maija and Aleksandrs Runcis, had two daughters, Milda Paberalis ("Milda") and Emilija Blums ("Emilija").  Emilija married Viktors Blums and they had one child, the Decedent.  Milda married Antons Paberalis ("Antons") on October 4, 1918.[14]  Vija's letters stated that her mother, Bronislava, was the daughter of Milda and Antons, and that Bronislava married Janis Putnina in 1940.[15]  Vija explained that she and Bronislava came to live with Milda and Antons after Bronislava was deported from Czechoslovakia in 1951, and that Vija was raised by Milda and Antons

---

[11] *Id.*; PX J; PX L; Tr. at 22.  Most of these events occurred during the period when Latvia was a republic of the Soviet Union.
[12] PX H.
[13] PX J.
[14] PX 1; PX 2.  Several documents refer to Antons as "Anton," but appear to be referring to the same individual.  For clarity, I use "Antons" throughout this report.
[15] PX 5.  Many of the documents refer to Bronislava's husband as Janis Putnins.  The origins of "Putnina" are not clear but also are not relevant to this matter.  I use "Putnina" throughout this report.

after Bronislava was arrested in 1951.[16]  The bulk of this history is undisputed and Vija

obtained confirmatory documentation for Mr. Cahill from Latvian archives.[17]  The only

key document Vija was unable to obtain was Bronislava's birth certificate.

Before Vija's claim to the Decedent's estate was resolved to Mr. Cahill's

satisfaction, a second possible heir was located.  Max S. Blum, a German citizen, is the

Decedent's first cousin on his paternal side.  On June 6, 2014, Mr. Cahill filed a Petition

for Decree of Distribution, asking the Court to determine the distribution of the

Decedent's estate after hearing evidence presented by Mr. Cahill and Mr. Blum.  I held

an evidentiary hearing on June 30, 2014, at which time it became clear that there was no

remaining dispute about Max Blum's claim to the Decedent's estate.[18]  The only question

in dispute at the hearing was whether the Max Blum is the sole heir, or whether half the

estate should be distributed to Vija.

Mr. Blum contends he is the sole heir because Mr. Cahill has not established by a

preponderance of the evidence that Bronislava was Milda's daughter.  Mr. Blum argues,

not without support, that Bronislava is the daughter of Antons and his other wife,

Viktorija, who he married a year after he married Milda.  It appears from the records that

Antons was married to two women simultaneously.[19]  In baptism records, Antons

---

[16] PX J.

[17] Tr. at 69.

[18] *Id.* at 87; Petition for Decree of Distribution ¶ 8.

[19] *Compare* PX 1 (church register entry indicating Milda and Antons were married on October 4, 1918) *with* Resp't Ex. (hereinafter "RX") 3 (records indicating Viktorija and Antons were married in 1919).

represented to the church that Bronislava was his daughter with Viktorija.[20] Although that record was certified in 1928, it is not clear when the baptism occurred or when it was recorded. Antons made similar representations in passport and citizenship applications in 1933, 11 years after Bronislava's birth.[21] It is undisputed that Bronislava's birth certificate has not and cannot be located, despite a diligent search by both claimants.[22]

Of course, if Bronislava was not Milda's daughter, then Bronislava – and by extension, Vija – are not related to the Decedent. Vija, however, offered her own history to fill in the gap created by the absence of Bronislava's birth certificate and to counter Mr. Blum's contentions. In letters to Mr. Cahill, Vija recounted that she lived with Milda and Antons from 1951 until Anton's death in 1958, and that she continued to live with Milda after Antons' death. During Vija's youth, Milda told her that she gave birth to a daughter in 1919, who died as an infant, and gave birth to a second daughter, Bronislava, in 1922. According to Milda's stories, retold by Vija, Antons wanted to call their daughter Bronislava, but Milda wanted to call her Brigita, so she was named Bronislava but called Brigita "in everyday life."[23] Milda, Antons, Bronislava, and presumably Viktorija, are deceased.[24] Mr. Cahill also introduced the affidavit of Irisa Henele, of Riga, Latvia, who attested that she knows Vija and knew both Bronislava and Milda, having grown up in the same town and having attended school with Vija (the "Henele

___

[20] RX 3.
[21] RX 3.
[22] Tr. at 67.
[23] PX L.
[24] Viktorija's whereabouts are unknown, although she presumably is dead, having been born in 1899.

Affidavit").[25]   Ms. Henele's sworn affidavit identifies Milda as Vija's grandmother.[26] The Henele Affidavit states that Ms. Henele's family was very close with Vija's family and that "everything is known about both families up till [sic] the fifth generation." Ms. Henele explained that her grandparents originated from the same parish as Milda's parents, that Ms. Henele's mother made dresses for Bronislava, and that Ms. Henele and Vija were classmates and have been friends for decades.[27]   Mr. Blum's counsel objected to this affidavit as inadmissible hearsay, but I admitted the affidavit into the record on the basis that it fell within Rule 803(19) of the Delaware Uniform Rules of Evidence, which establishes an exception to the hearsay rule for "[r]eputation concerning personal or family history."[28]

At the conclusion of the evidentiary hearing, I issued a draft oral report (the "Draft Report") recommending that the Court enter a decree that the Decedent's estate should be distributed to Vija and Mr. Blum in equal shares.  In my draft report, I reasoned that although the absence of any birth certificate for Bronislava was unfortunate, that gap in the record likely was explained by the turbulent period that began in Latvia in approximately 1918 and continued through the Second World War and the control of

---

[25] PX 18.

[26] *Id.*

[27] *Id.*

[28] Tr. at 57-58.  I also indicated that the affidavit might fall within Delaware Unif. R. Evid. 803(23).  Upon further reflection, however, that exception applies only to "judgments as to personal, family or general history, or boundaries," and the affidavit is not a "judgment."  *Cf. U.S. v. Boulware*, 384 F.3d 794 (9th Cir. 2004) (stating that Fed. R. Evid. 803(23), which is analogous to Del. Unif. R. Evid. 803(23), applies to certain kinds of judicial judgments).

Latvia by the Soviet Union.[29]  It is not altogether surprising, given those events, that births may not have been recorded in the usual manner, or that records may have been destroyed as various forces occupied the country.  Similarly, given the political climate, along with Antons' apparent "double life" as a spouse to two different women simultaneously, I discounted representations he made to various authorities several years after Bronislava's birth, and placed more weight on Vija's upbringing, the fact that Bronislava and Vija both were treated throughout Vija's lifetime as the issue of Antons and Milda, and the affidavit offered by Ms. Henele.[30]  Mr. Blum filed a timely notice of exception and the parties briefed those exceptions.

## ANALYSIS

Mr. Blum raises two arguments in his exceptions to the Draft Report.  He first argues that the Henele Affidavit is hearsay and that I erred in admitting it under the "[r]eputation concerning personal or family history" exception in Rule 803(19) of the Delaware Uniform Rules of Evidence ("Rule 803(19)").  Mr. Blum argues that, to be admissible under Rule 803(19), an affidavit must be sufficiently trustworthy and should be excluded if there is ascertainable bias or motive on behalf of the affiant.  According to Mr. Blum, the Henele Affidavit lacks indications that it is free from the risk of inaccuracy or untrustworthiness generally associated with hearsay statements, and is unreliable

---

[29] *See generally* History of Latvia: a timeline, http://www.latvia.lv/library/history-latvia-timeline (last visited Oct. 30, 2014).

[30] I also recommended that the Court grant Mr. Cahill's request for a commission equal to four percent of the value of the estate, plus expenses and attorneys' fees.  Mr. Blum did not oppose that request and has not taken exception to that recommendation.

because it was made after Vija became aware that she stood to inherit a substantial sum

of money from the Decedent's estate.

In its entirety, Rule 803(19) provides:

The following are not excluded by the hearsay rule, even though the
declarant is available as a witness:

* * *

(19) Reputation concerning personal or family history.  Reputation among
members of his family by blood, adoption or marriage, or among his
associates or in the community, concerning a person's birth, adoption,
marriage, divorce, death, legitimacy, relationship by blood, adoption or
marriage, ancestry or other similar fact of his personal or family history.[31]

Although I could not find any Delaware case interpreting this hearsay exception, it

is substantively identical to Federal Rule of Evidence 803(19), and federal cases or

treatises explaining the exception therefore are persuasive.  The Advisory Committee

Notes to Rule 803 explain that this exception to the hearsay rule persists because

[t]rustworthiness in reputation evidence is found 'when the topic is such
that the facts are likely to have been inquired about and that persons having
personal knowledge have disclosed facts which have thus been discussed in
the community; and thus the community's conclusion, if any has been
formed, is likely to be a trustworthy one.'[32]

According to one leading treatise on the topic, this rule developed under the common law

on the theory that reliability was "assured by the probability that[,] absent motive to

fabricate, discussions with relatives (and others intimately associated) regarding family

members would be accurate."[33]

---

[31] Del. Unif. R. Evid. 803(19).
[32] Fed. R. Evidence 803 "Notes" (citing 5 Wigmore on Evidence § 1580, p. 444).
[33] 2 McCormick on Evidence § 322 (7th ed. 2013).

Although statements falling within this exception are believed to be sufficiently trustworthy to be admitted, the federal courts typically require that a witness wishing to testify about a person's reputation concerning personal or family history establish a foundation of knowledge "grounded in inquiry, discussion, interactions, or familiarity."[34] Applying that standard, the District Court of New Jersey held that statements regarding whether a person supported a child financially and held her out as his child were admissible under Federal Rule 803 of Evidence (19) to determine the paternity of the child.[35]

Although Mr. Blum argues otherwise, the Henele Affidavit contains the necessary foundation for this Court to admit it under Rule 803(19) as evidence of Bronislava's ancestry. Ms. Henele's sworn statements indicate that she has known Vija for several decades and that members of Ms. Henele's family knew Bronislava and Milda for a lengthy period. The Henele Affidavit states that Bronislava was Milda's daughter and it is reasonable to conclude that a person's parentage is such a "marked item in the ordinary family history" that statements about such parentage in the family or community are likely to be accurate and sincerely uttered by persons with personal knowledge of the

---

[34] *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 100 (3d Cir. 1999). *See also id.* at 101 ("A witness who wishes to testify about someone's reputation within a community must demonstrate that he or she knows of the person and is truly familiar with the 'community' in which the reputation has been formed, and that the basis of the reputation is one that is likely to be reliable."); *Porter v. Quarantillo*, 722 F.3d 94, 98 (2nd Cir. 2013) (stating that the Court will inquire whether "the circumstances named in the statement [were] such a marked item in the ordinary family history and so interesting to the family in common that statements about them in the family would be likely to be based on fairly accurate knowledge and to be sincerely uttered[.]").

[35] *McBride v. Heckler*, 619 F.Supp. 1554, 1561-62 (D.N.J. 1985).

facts.[36]   The Henele Affidavit provides sufficient detail regarding the declarant's familiarity with the family that the statements fall within Rule 803(19).

Mr. Blum mistakenly relies on the Second Circuit's decision in *Porter v. Quarantillo* for the proposition that the affidavit is untrustworthy because it references facts "that are remote in time."[37]   The Court in *Porter* concluded that statements by individuals regarding a family member's age at the time she moved to a foreign country, when the testifying individuals had no personal knowledge of those facts, did not qualify as "similar facts of personal or family history" within Federal Rule of Evidence 803(19) because a person's age at the time of foreign travel was not "such a marked item in the ordinary family history" that it fell within the rule.[38]   It was not the remoteness of the events, but their significance to the family history, that led the Court to exclude the evidence.   In contrast, Bronislava's parentage is one such "marked item" of family history, as demonstrated by the rule's specific reference to "relationship by blood" as statements that fall within the exception.

I also disagree with Mr. Blum's position that the Henele Affidavit must be excluded because Vija, and by extension Ms. Henele, had motive to misstate facts to further Vija's claim as the Decedent's heir.   According to the McCormick treatise, when the "personal and family history" exception was codified in the Federal Rules of Evidence, the drafters adopted the "liberal view" under the common law, eliminating the

---

[36] *See Porter*, 722 F.3d at 98; Fed. R. Evid. 803 "Notes."
[37] *See* Br. in Supp. of Exceptions at 9.
[38] 722 F.3d at 98-99.

requirement that the statement be made without motive to misrepresent the facts, leaving issues of motive or bias to be treated as questions of weight or excluded under Rule 403 in "extreme cases."[39] Rule 403 of the Delaware Uniform Rules of Evidence allows the Court to exclude otherwise relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Although Mr. Blum is correct that the Henele Affidavit was made after Vija became aware of the estate and her possible claim to it, I do not believe the potential for bias under these circumstances warrants exclusion of the evidence under Rule 403 and therefore believe that those questions are best addressed by considering what weight should be given to the affidavit.

Mr. Blum also argues that, even if the affidavit is admissible, Mr. Cahill did not prove Vija's lineage by a preponderance of the evidence. This portion of Mr. Blum's argument asserts that the certified documents he admitted, stating that Bronislava was the child of Antons and Viktorija, far outweigh the evidence Mr. Cahill offered that Bronislava was the child of Antons and Milda. Mr. Blum places special significance on the absence of a birth certificate for Bronislava, as well as the absence of any marriage license for Antons and Milda, and contends that this Court should not rely solely on the statements offered by Vija and supported by the Henele Affidavit.

To establish Vija's position as the Decedent's heir, the Court must conclude that it is more likely than not that Vija – and by extension Bronislava – were the issue of Milda

---

[39] 2 McCormick on Evidence § 322 (7th ed. 2013).

Paberalis. As this court recently explained, proof by a preponderance of the evidence "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[40] Mr. Blum appears to argue that the documents he admitted – given their status as "official" church and government documents – should be given greater weight than the statements of Vija and Ms. Henele. Although that might be the result in an ordinary case, the facts of this case are unique for a number of reasons. First, the government documents on which Mr. Blum relies all appear to be based on apparent representations made by Antons several years after Bronislava's birth and in connection with travel and citizenship applications. The evidence does not indicate when the baptismal record was made. Mr. Paberalis – a man who was apparently leading a double life – was traveling and requesting citizenship in Eastern Europe in a time of war and political upheaval, and there is nothing on the record to indicate that the church or the Latvian government would have reason to independently investigate Mr. Paberalis's representations. For that reason, I do not give those documents conclusive weight.

Second, although the absence of either a birth certificate for Bronislava, or a marriage certificate for Milda and Antons is unusual, it does not tip the scales in either direction in this case. Just as there is no birth certificate indicating that Bronislava was the daughter of Milda and Antons, there is no birth certificate indicating she is the

---

[40] *Mitchell Lane Publishers, Inc. v. Rasemas*, 2014 WL 4925150, at *3 (Del. Ch. Sept. 30, 2014) (quoting *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009)).

daughter of Viktorija and Antons. Similarly, whether Milda and Antons were married is of no moment to Bronislava's relationship to Milda.[41]

Finally, the fact that Vija's statements regarding her relationship to the Decedent were made months before she became aware of any possible inheritance warrants considerable attention. Vija's initial letters to Mr. Cahill, in which she first stated that Bronislava was the Decedent's cousin, indicated an interest in finding relatives and a hope that the Decedent had issue with whom Vija might connect. Because those statements were made without apparent pecuniary motive, they are relieved of the concerns of fabrication raised by Mr. Blum. In addition, although Mr. Blum contends that the Henele Affidavit is motivated by Vija's interest in inheriting a portion of the estate, the Henele Affidavit only confirms Vija's initial statements regarding her lineage, substantially weakening the contention that the affidavit is colored by motive. I am therefore left to weigh the representations made by Antons, which are not entirely reliable for the reasons indicated, with the fact that Milda held Bronislava and Vija out as her issue, even after Antons passed away, and supported Bronislava's child during the period Bronislava was imprisoned. Considering the unique facts of this case, Milda's actions toward Bronislava and Vija establish by a preponderance of the evidence that Bronislava was Milda's daughter.

Finally, Mr. Blum argues for the first time in his reply brief that this Court should reopen the record to permit Mr. Blum to search for and introduce additional records "to

---

[41] There are other certified documents indicating that Milda and Anton were married or at least living together as husband and wife.

authenticate the information contained in the last-minute [Henele] [A]ffidavit."[42]  This argument, however, was not advanced by Mr. Blum at the evidentiary hearing or in his opening brief, and no motion has been filed asking the Court to reopen the record or accept new evidence.  Fairly read, Mr. Blum appears to be asking the Court for additional time to search for new evidence; there is no indication that any such evidence has been located.  Mr. Blum presumably could have searched for additional evidence without leave of the Court.  Having elected not to do so, however, and having chosen to hold this argument until the reply brief, I do not believe there is good cause to further delay this case.

## CONCLUSION

For the foregoing reasons, I recommend that the Court grant the petition for decree of distribution and enter an order finding that Max Blum and Vija Putnina are the Decedent's heirs.  This is my final report and exceptions may be taken in accordance with Court of Chancery Rule 144.

Respectfully submitted,

*/s/ Abigail M. LeGrow*

Master in Chancery

---

[42] Am. Reply Br. in Supp. of Exceptions at 5.